# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AMERICANS FOR IMMIGRANT JUSTICE**, et al., | |
| *Plaintiffs*, | |
| v. | No. 1:22-cv-03118 (CKK) |
| **U.S. DEPARTMENT OF HOMELAND SECURITY**, et al., | |
| *Defendants*. | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF FACTS .................................................................................. 2

      A.    Plaintiffs' Detained Clients Face Urgent Challenges Requiring Adequate
            Legal Representation. ............................................................................... 2

      B.    Defendants Are Responsible for Ensuring Attorney Access at ICE Detention
            Facilities. ................................................................................................. 5

      C.    Defendants Restrict Attorney-Client Communications at the Four Detention
            Facilities. ................................................................................................. 8

            1.    Defendants Restrict Reliable Access to Free, Confidential Telephone
                  Calls. ............................................................................................ 8

            2.    Defendants Restrict Access to Reliable, Confidential In-Person
                  Attorney-Client Visits at the Four Detention Facilities. ........................... 11

            3.    Defendants Restrict Access to Free, Confidential VTC Attorney-
                  Client Visits at the Four Detention Facilities............................................ 14

            4.    Defendants Restrict Plaintiffs and Detained Clients at the Four
                  Detention Facilities from Sending and Receiving Legal Documents....... 14

            5.    Defendants Fail to Make Reasonable Accommodations for FIRRP
                  and AIJ's Clients with Disabilities at Florence and Krome..................... 15

III.  LEGAL STANDARD........................................................................................ 18

IV.   ARGUMENT .................................................................................................... 19

      A.    Plaintiffs Have Third-Party Standing to Bring Claims on Behalf of Detained
            Clients. ................................................................................................... 19

      B.    Plaintiffs Are Likely to Succeed on the Merits of Detained Clients' Fifth
            Amendment Claims. ................................................................................ 22

            1.    Defendants' Restrictions on Adequate Access to Counsel Constitutes
                  Punishment in Violation of Detained Clients' Substantive Due
                  Process Rights. ............................................................................. 22

            2.    Defendants' Restrictions on Adequate Access to Counsel at the Four
                  Detention Facilities Deprive Detained Clients of Their Due Process
                  Right to a Full and Fair Custody Proceeding............................................ 27

C.      Plaintiffs Are Likely to Succeed on the Merits of Their APA Claim. .................. 31

D.      Plaintiffs FIRRP and AIJ Are Likely to Succeed on the Merits of Their Claim Under Section 504 of the Rehabilitation Act. ....................................................... 36

E.      Defendants' Failure to Ensure Adequate Access to Counsel at the Four Detention Facilities Causes Detained Clients and Plaintiffs to Suffer Irreparable Harm. ................................................................................................ 40

F.      The Balance of Equities and Public Interest Weigh Heavily in Plaintiffs' Favor. ................................................................................................................... 43

V.      CONCLUSION ............................................................................................................ 44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs v. Gardner*,
   387 U.S. 136 (1967), *abrogated on other grounds* by *Califano v. Sanders*,
   430 U.S. 99 (1977)..................................................................................35

*Abdullah v. Obama*,
   753 F.3d 193 (D.C. Cir. 2014)..............................................................18

*United States ex rel. Accardi v. Shaughnessy*,
   347 U.S. 260 (1954)....................................................................32, 33, 34

*Adams v. Rice*,
   531 F.3d 936 (D.C. Cir. 2008)..............................................................38

*Addington v. Texas*,
   441 U.S. 418 (1979)..............................................................................29

*Am. Council of the Blind v. Paulson*,
   525 F.3d 1256 (D.C. Cir. 2008)............................................................37

*Aracely R. v. Nielsen*,
   319 F. Supp. 3d 110 (D.D.C. 2018)...........................................33, 34, 42

*Armstrong v. Manzo*,
   380 U.S. 545 (1965)..............................................................................28

*Atherton v. D.C. Off. of Mayor*,
   567 F.3d 672 (D.C. Cir. 2009)..............................................................28

*Battle v. FAA*,
   393 F.3d 1330 (D.C. Cir. 2005)............................................................32

*Bell v. Wolfish*,
   441 U.S. 520 (1979)..............................................................................23

*Bennett v. Spear*,
   520 U.S. 154 (1997).........................................................................35, 36

*Citizens for Resp. & Ethics in Wash. v. U.S. Off. of Special Couns.*,
   480 F. Supp. 3d 118 (D.D.C. 2020).......................................................20

*Clerveaux v. Searls*,
   397 F. Supp. 3d 299 (W.D.N.Y. 2019)...................................................29

*CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*,
    637 F.3d 408 (D.C. Cir. 2011) ........................................................................36

*Ctr. for Biological Diversity v. Zinke*,
    260 F. Supp. 3d 11 (D.D.C. 2017) ................................................................34

*Damus v. Nielsen*,
    313 F. Supp. 3d 317 (D.D.C. 2018) ..............................................................32

*Davenport v. Int'l Bhd. of Teamsters*,
    166 F.3d 356 (D.C. Cir. 1999) ......................................................................18

*Demore v. Kim*,
    538 U.S. 510 (2003) ......................................................................................28

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
    489 U.S. 189 (1989) ........................................................................................6

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
    878 F.3d 371 (D.C. Cir. 2017) ......................................................................19

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015) ................................................................19, 20

*Foucha v. Louisiana*,
    504 U.S. 71 (1992) ........................................................................................28

*Franco-Gonzalez v. Holder*,
    No. 10-02211, 2013 WL 3674492 (C.D. Cal. Apr. 23, 2013) ..................37, 38

*Franco-Gonzalez v. Holder*,
    No. 10-02211, 2014 WL 5475097 (C.D. Cal. Oct. 29, 2014) ..................15, 37

*Freedom Watch, Inc. v. McAleenan*,
    442 F. Supp. 3d 180 (D.D.C. 2020) ..............................................................20

*Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016) ......................................................................44

*Matter of Guerra*,
    24 I. & N. Dec. 37 (BIA 2006) ...............................................................2, 3, 30

*Hernandez-Lara v. Lyons*,
    10 F.4th 19 (1st Cir. 2021) ....................................................2, 30, 31, 44

*Immigrant Defs. L. Ctr. v. U.S. Dep't of Homeland Sec.*,
    No. 21-0395, 2021 WL 4295139 (C.D. Cal. July 27, 2021) ..........................35

*Johnson v. Arteaga-Martinez*,
    142 S. Ct. 1827 (2022) ............................................................................................30

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ..........................................................................18, 41

*Lepelletier v. FDIC*,
    164 F.3d 37 (D.C. Cir. 1999) ........................................................................21, 22

*Mathews v. Diaz*,
    426 U.S. 67 (1976) ........................................................................................28, 29

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ......................................................................................29, 30

*Mills v. Dist. of Columbia*,
    571 F.3d 1304 (D.C. Cir. 2009) ...........................................................................41

*Moghaddam v. Pompeo*,
    424 F. Supp. 3d 104 (D.D.C. 2020) .............................................................33, 34

*Morton v. Ruiz*,
    415 U.S. 199 (1974) .............................................................................................32

*Nat. Res. Def. Council v. Wheeler*,
    955 F.3d 68 (D.C. Cir. 2020) ..............................................................................35

*Niece v. Fitzner*,
    922 F. Supp. 1208 (E.D. Mich. 1996) .................................................................38

*Norton v. S. Utah W. All.* (*SUWA*),
    542 U.S. 55 (2004) ...............................................................................................33

*Nunez v. Boldin*,
    537 F. Supp. 578 (S.D. Tex. 1982) ......................................................................44

*O'Donnell v. U.S. Agency for Int'l Dev.*,
    No. 18-03126, 2019 WL 2745069 (D.D.C. July 1, 2019) ....................................33

*Pangea Legal Services v. U.S. Dep't of Homeland Sec.*,
    512 F. Supp. 3d 966 (N.D. Cal. 2021) .................................................................43

*Pierce v. Dist. Of Columbia*,
    128 F. Supp. 3d 250 (D.D.C. 2015) .....................................................................38

*Powers v. Ohio*,
    499 U.S. 400 (1991) ......................................................................................19, 22

*R.I.L-R v. Johnson,*
  80 F. Supp. 3d 164 (D.D.C. 2015) .........................................................................23, 24, 28, 42

*Ramirez v. U.S. ICE,*
  310 F. Supp. 3d 7 (D.D.C. 2018) .........................................................................................42

*Rogers v. Colo. Dep't of Corr.,*
  No. 16-02733, 2019 WL 4464036 (D. Colo. Sept. 18, 2019)...........................................38, 40

*S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec.,*
  No. 18-760, 2020 WL 3265533 (D.D.C. June 17, 2020)................................................. *passim*

*Sherley v. Sebelius,*
  644 F.3d 388 (D.C. Cir. 2011) .............................................................................................18

*Simms v. Dist. of Columbia,*
  872 F. Supp. 2d 90 (D.D.C. 2012) .......................................................................................44

*Sorto-Vasquez Kidd v. Mayorkas,*
  No. 20-03512, 2021 WL 1612087 (C.D. Cal. Apr. 26, 2021) .................................................34

*Tennessee v. Lane,*
  541 U.S. 509 (2004).............................................................................................................36

*Torres v. U.S. Dep't of Homeland Sec.,*
  No. 18-2604, 2020 WL 3124216 (C.D. Cal. Apr. 11, 2020)............................................26, 44

*Torres v. U.S. Dep't of Homeland Sec.,*
  No. 18-2604, 2020 WL 3124305 (C.D. Cal. Apr. 24, 2020).................................................26

*Torres v. U.S. Dep't of Homeland Sec.,*
  411 F. Supp. 3d 1036 (C.D. Cal. 2019) ..............................................................23, 24, 34, 36

*Turlock Irr. Dist. v. FERC,*
  786 F.3d 18 (D.C. Cir. 2015) ...............................................................................................19

*Turner v. Rogers,*
  564 U.S. 431 (2011).............................................................................................................29

*Turner v. U.S. Agency for Glob. Media,*
  502 F. Supp. 3d 333 (D.D.C. 2020) ......................................................................................21

*United States v. Aguirre-Tello,*
  324 F.3d 1181 (10th Cir. 2003) .............................................................................................2

*United States v. Salerno,*
  481 U.S. 739 (1987).............................................................................................................29

*Velasco Lopez v. Decker*,
   978 F.3d 842 (2d Cir. 2020).................................................31

*West v. Atkins*,
   487 U.S. 42 (1988)..........................................................6

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
   485 F. Supp. 3d 1 (D.D.C. 2020)........................................19

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)...........................................................18

*Youngberg v. Romeo*,
   457 U.S. 307 (1982)........................................................23

*Zadvydas v. Davis*,
   533 U.S. 678 (2001)...................................................28, 29

**Statutes**

5 U.S.C § 706...................................................1, 32, 33, 34

6 U.S.C. § 345(a)(4)...............................................................6

8 U.S.C. §§ 1104-1401 (Suppl. 2 1964). .......................2, 28, 30

29 U.S.C. § 794......................................................... *passim*

**Other Authorities**

6 C.F.R. § 15.2..................................................................40

8 C.F.R. § 212.5(b) ...........................................................4

8 C.F.R. § 236.1(d)(1).......................................................28

8 C.F.R. § 1236.1(c)(8)......................................................30

Fed. R. Civ. P. 65.............................................................45

*Lyon v. ICE*,
   No. 3:13-cv-05878 (N.D. Cal. June 13, 2016)......................25

*S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec.*,
   No. 18-0760 (D.D.C. Sept. 5, 2018) ...................................26

U.S. Const. Amend. V .......................................................28

## I.    INTRODUCTION

This case challenges the government's restrictions on communication between attorneys and their clients who are held in Immigration and Customs Enforcement ("ICE") detention facilities. The Constitution protects the rights of people held in immigration detention to retain, consult, and communicate with counsel. Defendants, however, have created barriers to communication so extreme that it is effectively impossible for attorneys to reliably schedule and conduct private, confidential phone or video-teleconference ("VTC") calls, hold confidential in-person meetings, and timely exchange legal documents with detained clients. Notably, these attorney-access conditions for immigrants in civil detention are often worse than those for people in criminal custody at many jails and prisons.

Plaintiffs, five non-profit legal organizations,[1] seek a preliminary injunction on behalf of themselves and clients and prospective clients ("Detained Clients") held at the Florence Correctional Center in Florence, Arizona ("Florence"), the Krome North Service Processing Center in Miami, Florida ("Krome"), the Laredo Processing Center in Laredo, Texas ("Laredo"), and the River Correctional Center in Ferriday, Louisiana ("River") (collectively, the "Four Detention Facilities").

A preliminary injunction is warranted here. Plaintiffs have a substantial likelihood of prevailing on the merits of their Fifth Amendment due process, Administrative Procedure Act ("APA"), and Rehabilitation Act claims. It has long been settled that all "persons" are entitled to due process under the Fifth Amendment, regardless of their immigration status. Under the Due

---

[1] Plaintiffs are Americans for Immigrant Justice ("AIJ"), the Florence Immigrant and Refugee Rights Project ("FIRRP"), the Immigration Justice Campaign ("IJC"), Immigration Services and Legal Advocacy ("ISLA"), and the Refugee and Immigrant Center for Education and Legal Services ("RAICES") (collectively, "Plaintiffs").

Process Clause, immigrants in civil detention cannot be subjected to conditions that constitute punishment, and are entitled to more considerate treatment than people in criminal custody. The government's restrictions on attorney access also deprive Detained Clients of the right to fundamentally fair custody proceedings to seek release from detention, and violate their own detention standards. At Florence and Krome, the government has failed to provide reasonable accommodations necessary for FIRRP and AIJ's clients with disabilities.

Any conceivable injury claimed by the government is outweighed by the irreparable harm currently borne by Plaintiffs and Detained Clients. Defendants' restrictions have prevented Plaintiffs from providing badly-needed legal services to detained immigrants, hindered communication between Plaintiffs and Detained Clients, and caused delayed or missed requests for release and complaints regarding conditions of confinement. Plaintiffs respectfully request that the Court require the government to provide them with reliable and confidential means to communicate with their clients in immigration detention.

## II.      STATEMENT OF FACTS

### A.      Plaintiffs' Detained Clients Face Urgent Challenges Requiring Adequate Legal Representation.

Plaintiffs' Detained Clients at the Four Detention Facilities face pressing and complicated legal challenges that will have profound impacts on their lives. Immigration law is notoriously complex, and in most instances the burden is on detained immigrants to prove that they are entitled to relief.[2] Immigration proceedings are generally adversarial and pit often unrepresented

---

[2] *See United States v. Aguirre-Tello*, 324 F.3d 1181, 1187 (10th Cir. 2003) ("[I]mmigration law is technical and complex to the point where it is confusing to lawyers, much less to laymen"); *Matter of Guerra*, 24 I. & N. Dec. 37, 40 (BIA 2006) (noncitizens bear burden of proof in seeking immigration bond) (abrogated in the First Circuit by *Hernandez-Lara v. Lyons*, 10 F.4th 19 (1st Cir. 2021); *see also, e.g.,* 8 U.S.C. § 1158(b)(1)(B) (placing burden of proof on noncitizen to demonstrate eligibility for asylum).

noncitizens against experienced U.S. Department of Homeland Security (DHS) attorneys.[3] These proceedings are commonly on expedited schedules, offering detained immigrants little time to prepare.[4] Detained immigrants often must attempt to navigate these challenges with few resources and limited English proficiency, while separated from their families and facing tremendous stress. *See* Declaration of Javier Hidalgo ("Hidalgo Decl.") ¶ 13; Declaration of Laura St. John ("St. John Decl.") ¶ 15; Declaration of Lisa Lehner ("Lehner Decl.") ¶ 28. For all these reasons, reliable, confidential access to counsel in detention is critical.

Plaintiffs have represented or currently represent Detained Clients in various immigration proceedings seeking release from detention through bond or parole and/or challenging conditions of confinement.[5] Bond and parole proceedings, which determine whether immigrants will be released from detention, are fast-paced and fact-intensive, and detained immigrants typically bear the burden of proving that they should be released.[6] Access to counsel in these proceedings makes

---

[3] *See* Declaration of Danielle Lee ("Lee Decl.") Ex. A, Executive Office for Immigration Review, Immigration Court Practice Manual ("Imm. Ct. Practice Manual"), § 9.1(e) (Aug. 17, 2022), https://bit.ly/3DifMA8 (hearings are held for detained noncitizens); Ex. B, Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. PA. L. REV. 1, 2 (2015) (only 37% of immigrants had counsel in immigration court between 2007 and 2012).

[4] *See* Lee Decl. Ex. A, Imm. Ct. Practice Manual, § 9.1(e) ("Proceedings for detained respondents are expedited."); Declaration of Homero López ("López Decl.") ¶ 22 (preparing for hearings requires working in "an expedient fashion").

[5] Unlike other plaintiffs, IJC does not maintain a direct attorney-client relationship with Detained Clients. Rather, it matches third-party volunteer attorneys with detained immigrants in need of pro bono representation. However, IJC maintains a close relationship with Detained Clients in the form of continuous, one-on-one mentoring of the volunteer attorney throughout the engagement. Declaration of Rebekah Wolf ("Wolf Decl.") ¶¶ 5-25. IJC retains responsibility for the client's case and reserves the right to end the engagement with counsel if the assigned volunteer attorney does not meet IJC's standards. Wolf Decl. ¶¶ 14, 25. Unless indicated otherwise, references to Plaintiffs, Plaintiffs' attorneys, or similar references, also refer to IJC's volunteer attorneys, and references to Plaintiffs' clients, or Detained Clients, also refer to detained immigrant clients whom IJC matches with volunteer attorneys.

[6] *See* Lee Decl. Ex. A, Imm. Ct. Practice Manual § 9.3(d), (bond hearings should be scheduled for "earliest possible date"); *Guerra*, 24 I. & N. Dec. at 38 (describing factors noncitizen must

a measurable difference: detained immigrants are **seven times** more likely to be released on bond when represented by counsel.[7]

Challenges to conditions of confinement, like inadequate medical care, sexual assault, retaliation, and use of force, are likewise complex and of great importance to Detained Clients. *See* Lehner Decl. ¶¶ 18-21; St. John Decl. ¶ 15. Such challenges benefit from early intervention by Plaintiffs and may require extensive fact discovery and support. Lehner Decl. ¶ 21. This type of representation includes filing administrative complaints and lawsuits. *See* Wolf Decl. ¶ 29; St. John Decl. ¶ 15; Lehner Decl. ¶¶ 25–26.

Given the procedural requirements, legal complexities, burdens of proof, and short timelines in these proceedings, Plaintiffs and Detained Clients need, and are entitled to, reliable means to confidentially communicate and share privileged and sensitive information relevant to their cases. The ability to access interpretation is also essential where the attorney and client do not speak the same language. *See* Declaration of Andrea Jacoski ("Jacoski Decl.") ¶¶ 22, 37.

Confidential communication is crucial to discussing sensitive, privileged matters candidly and without concern of unintentionally waiving attorney-client privilege or disclosing information that may cause clients to suffer harassment, abuse, retaliation, or severe distress while detained.

---

establish and standard they must meet to win a grant of bond); 8 C.F.R. § 212.5(b) (listing factors for evaluating requests for parole from immigration custody); Hidalgo Decl. ¶ 11 (noting the necessary information to make an effective request for release).

[7] *See* Lee Decl. Ex. B, Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. Pa. L. Rev. 1, 30 (2015) (describing different outcomes for non-citizens based on representation in removal proceedings between 2007 and 2012); *see also* Lee Decl. Ex. C, Jennifer Stave et al., Evaluation *of the New York Immigrant Family Unity Project: Assessing the Impact of Legal Representation on Family and Community Unity* 60 (Nov. 2017), https://bit.ly/3euAIdD (success rate for immigrant detainees with legal counsel is predicted to be 1,100 percent greater than for pro se detainees in New York City); Ex. D, Emily Ryo, *Detained: A Study of Immigration Bond Hearings*, Law & Soc'y Rev. 117, 119 (2016) (immigrant detainees' likelihood of securing bond is substantially higher when represented by counsel).

*See* St. John Decl. ¶ 19; Hidalgo Decl. ¶ 21; Jacoski Decl. ¶¶ 21, 49. Confidential communication is particularly necessary for attorneys to build rapport with detained immigrants, who often exhibit fear and distrust due to unfamiliarity with the legal process. Hidalgo Decl. ¶ 16; Jacoski Decl. ¶ 35. The ability to communicate and exchange legal documents confidentially must be reliable enough that attorneys and clients can timely discuss factual and legal matters. Yet Defendants have restricted Plaintiffs' ability to meet confidentially with Detained Clients in the most basic ways.

Remote forms of communication, such as telephone, VTC, and exchanging documents by fax and/or email are often the only viable means for Plaintiffs and Detained Clients to communicate. However, Defendants' barriers to communication have made these options functionally unavailable, forcing counsel to travel up to three or four hours *each way* to meet clients in person, even for the most minor matters. López Decl. ¶ 9; Hidalgo Decl. ¶ 8. Traveling to timely meet in person with a client is often inefficient or impossible, given that most of the facilities are a significant distance from major city centers where Plaintiffs' offices are located. López Decl. ¶ 5 (River is 180 miles from ISLA's New Orleans office); Hidalgo Decl. ¶ 8 (Laredo is 170 miles from RAICES's San Antonio offices); St. John Decl. ¶ 14 (Florence is 70 miles from FIRRP's Phoenix and Tucson offices). IJC volunteer attorneys provide remote representation to people detained in geographically isolated facilities. Wolf Decl. ¶ 26. As a result, remote means of communication are often necessary for Plaintiffs and Detained Clients to conduct time-sensitive conversations, especially in urgent situations.

### B. Defendants Are Responsible for Ensuring Attorney Access at ICE Detention Facilities.

As the federal agencies and officials responsible for managing the immigration system, Defendants are responsible for ensuring that detained immigrants' access to counsel comports with constitutional and federal law requirements. *See DeShaney v. Winnebago Cnty. Dep't of Soc.*

*Servs.*, 489 U.S. 189, 200 n.8 (1989); *see, e.g.*, 6 U.S.C. § 345(a)(4). Where Defendants contract with local jurisdictions and private prison companies to manage detention facilities, they are not absolved from that duty. *See West v. Atkins*, 487 U.S. 42, 55–56 (1988). To the contrary, Defendants continue to have an "affirmative obligation" to ensure that the detention facilities comply with constitutional requirements. *Id.* at 56.

Recognizing that "ICE has important obligations under the U.S. Constitution and other federal and state law when it decides to keep an individual in custody," Defendants have developed standards governing conditions in immigration detention, including conditions at the Four Detention Facilities (collectively, the "Detention Standards").[8] These Detention Standards provide rules and requirements for conditions including confidential attorney-client meetings,[9] legal visitation,[10] interpretation services,[11] confidential attorney-client telephone conversations,[12] direct

---

[8] Lee Decl. Ex. E, ICE, National Detention Standards 2019 ("2019 NDS"), https://bit.ly/3eMSWr7; *see also* Lee Decl. Ex. F, ICE, Performance-Based National Detention Standards 2008 ("2008 PBNDS"), https://bit.ly/3F0Xq84; Ex. G, ICE, Performance-Based National Detention Standards 2011, revised in 2016 ("2011 PBNDS"), https://bit.ly/3gtp2IS. The Four Defendant Detention Facilities are governed by different, but substantially similar, detention standards. Florence Correctional Center is governed by the 2008 PBNDS. Krome and River are governed by the 2011 PBNDS. Laredo is governed by the 2019 NDS. *See* Lee Decl. Ex. H, ICE, ERO Custody Management Division, Authorized Dedicated Facility List, https://bit.ly/32BCFJW (Sept. 5, 2022) (specifying standards applicable to each facility).
[9] *See, e.g.*, Lee Decl. Ex. F, 2008 PBNDS § 5.32(V)(J)(9); Ex. G, 2011 PBNDS § 5.7(V)(J)(9); Ex. E, 2019 NDS § 5.5(II)(G)(8).
[10] *See, e.g.*, Lee Decl. Ex. F, 2008 PBNDS § 5.32(V)(J)(2); Ex. G, 2011 PBNDS § 5.7(V)(J)(2); Ex. E, 2019 NDS § 5.5(II)(G)(2).
[11] *See e.g.*, Lee Decl. Ex. F, 2008 PBNDS § 5.32(V)(J)(3)(c); Ex. G, 2011 PBNDS § 5.7(V)(J)(3)(c); *id.* § 5.7(II)(10); Ex. E, 2019 NDS § 5.5(II)(G)(3)(c).
[12] *See, e.g.*, Lee Decl. Ex. F, 2008 PBNDS § 5.31(II)(5); *id.* § 5.31(V)(F)(2); Ex. G, 2011 PBNDS § 5.6(II)(4)–(6); *id.* § 5.6(V)(F)(2); Ex. E, 2019 NDS § 5.4(II)(J).

or free calls to legal representatives,[13] delivery of messages to detainees,[14] duration of legal calls,[15] and confidentiality of legal mail[16] (collectively, "Attorney Access Provisions"). ICE incorporates these binding standards into contracts with facility operators, and regularly initiates and conducts compliance reviews and inspections of all detention facilities to ensure compliance with the Detention Standards.[17] However, ICE has consistently failed to enforce compliance with its Detention Standards. And while ICE conducts inspections and monitors detention facilities, including the Four Detention Facilities,[18] DHS's Office of Inspector General has concluded that "neither the inspections nor the onsite monitoring ensure consistent compliance with detention standards, nor do they promote comprehensive deficiency corrections."[19]

These failures extend to Detention Standards regarding attorney access. ICE admitted to Congress earlier this year that, despite regular inspections of facilities, it "does not track . . . the

---

[13] *See* Lee Decl. Ex. F, 2008 PBNDS § 5.31(V)(E); Ex. G, 2011 PBNDS § 5.6(V)(E); Ex. E, 2019 NDS § 5.4(II)(E).

[14] *See* Lee Decl. Ex. F, 2008 PBNDS § 5.31(V)(J); Ex. G, 2011 PBNDS § 5.6(V)(J); Ex. E, 2019 NDS § 5.4(II)(I).

[15] *See* Lee Decl. Ex. F, 2008 PBNDS § 5.31(V)(F)(1); Ex. G, 2011 PBNDS § 5.6(V)(F)(1); Ex. E, 2019 NDS § 5.4(II)(F).

[16] *See* Lee Decl. Ex. F, 2008 PBNDS § 5.26(V)(G)(2); Ex. G, 2011 PBNDS § 5.1(V)(G)(2); Ex. E, 2019 NDS § 5.1(II)(E)(2).

[17] Lee Decl. Ex. I, DHS Office of Inspector General, *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to* Sustained *Compliance or Systemic Improvements* 2–3 (2018) ("2018 DHS-OIG Report"), https://bit.ly/2Mwp2Ug.

[18] *See, e.g.*, Lee Decl. Ex. J, DHS, ICE, Off. of Det. Oversight, *Compliance Inspection of the Laredo Processing Center* 5 (2022) ("Laredo Inspection"), http://bit.ly/3OcQ18b ("ODO conducts oversight inspections of ICE detention facilities with an average daily population greater than ten, where detainees are housed for longer than 72 hours, to assess compliance with ICE national detention standards."); Ex. K, DHS, ICE Off. of Det. Oversight, *Follow-Up Compliance Inspection of the River Correctional Center* 5 (2022) ("River Inspection"), http://bit.ly/3UYRhy1 (same); Ex. L, DHS, ICE, Off. of Det. Oversight, *Follow-Up Compliance Inspection of the Krome North Service Processing Center* 5 (2022) ("Krome Inspection"), https://bit.ly/3eZ2Vtc (same); Ex. M, DHS, ICE, Off. of Det. Oversight, *Follow-Up Compliance Inspection of the CCA Florence Correction Center* 5 (2022) ("Florence Inspection"), https://bit.ly/3MTv29U (same).

[19] Lee Decl. Ex. I, 2018 DHS-OIG Report, *supra* note 17.

number of facilities that do not meet ICE standards for attorney/client communications."[20] On November 3, 2022, twenty-eight members of Congress wrote to DHS and ICE, noting that "ICE has failed as an agency to exercise even the most basic oversight or data collection regarding immigrants' access to counsel in detention."[21] As the agency's most recent facility inspection reports indicate, ICE has failed to investigate detention standards associated with attorney access at the Four Detention Facilities.[22] Even if the Detention Standards were followed, however, the standards are not in line with constitutional requirements, and in many respects, fall short.

**C.    Defendants Restrict Attorney-Client Communications at the Four Detention Facilities.**

Defendants have restricted the ability of Plaintiffs and Detained Clients to communicate in myriad ways. *First*, Defendants restrict Plaintiffs' and Detained Clients' ability to communicate confidentially by phone. *Second*, Defendants prevent Plaintiffs and Detained Clients from meeting confidentially in person. *Third*, Defendants fail to provide, or where provided, fail to make known the availability of VTC for legal visits. *Fourth*, Defendants restrict Plaintiffs' and Detained Clients' ability to reliably and expeditiously exchange legal correspondence. *Finally*, Defendants fail to make reasonable accommodations for FIRRP and AIJ and their clients with disabilities detained at Florence and Krome to reliably and confidentially communicate with each other.

**1.    Defendants Restrict Reliable Access to Free, Confidential Telephone Calls.**

---

[20] Lee Decl. Ex. N, ICE, *Access to Due Process: Fiscal Year 2021 Report to Congress* 2, Feb. 14, 2022, https://bit.ly/3F1TMek.

[21] Lee Decl. Ex. O, Letter from Twenty-Eight Members of Congress to Alejandro Mayorkas, Secretary of DHS, and Tae Johnson, Acting Director, ICE (Nov. 3, 2022), https://bit.ly/3UsZMBI.

[22] *See* Lee Decl. Ex. J, Laredo Inspection, *supra* note 18, at 6; Ex. K, River Inspection, *supra* note 18, at 6; Ex. L, Krome Inspection, *supra* note 18, at 6; Ex. M, Florence Inspection, *supra* note 18, at 6.

Defendants restrict Detained Clients' access to legal phone calls by: (i) failing to provide private areas for calls, (ii) refusing to allow attorneys to schedule calls with Detained Clients or creating burdensome scheduling requirements, (iii) charging Detained Clients for legal calls and imposing unreasonable restrictions on access to pro bono hotlines, (iv) imposing unreasonable time limits, and (v) failing to provide access to working phones.

*Lack of Private, Confidential Phone Calls.* At each of the Four Detention Facilities, Defendants fail to provide access to private spaces for Detained Clients to conduct legal phone calls with their attorneys. Hidalgo Decl. ¶ 20; St. John Decl. ¶¶ 16, 19; López Decl. ¶ 31; Jacoski Decl. ¶ 15; Lehner Decl. ¶ 12. Phones are often placed in public spaces, such as in the housing units, where conversations can be easily overheard by others, or where there is so much noise that Detained Clients cannot hear. Hidalgo Decl. ¶ 20; St. John Decl. ¶¶ 16, 19; López Decl. ¶ 31; Jacoski Decl. ¶ 15; Lehner Decl. ¶ 12. Lack of access to private, confidential telephone calls directly harms Plaintiffs and Detained Clients. Detained Clients often cannot safely or comfortably share sensitive information with their attorneys critical to their cases for fear of disclosure to others within earshot of the call. *See e.g.*, López Decl. ¶¶ 31-32; Wolf Decl. ¶ 44.

*Lack of Scheduling Procedures for Phone Calls*. Plaintiffs also face significant barriers to scheduling phone calls with Detained Clients. Without the ability to schedule phone calls, attorneys cannot reliably speak with clients at a designated time, which leaves the ability to talk with clients largely to chance. The inability to schedule phone calls also prevents the participation of interpreters necessary for communication with clients who do not speak English; many interpretation services, particularly for rarer languages, require advance notice to ensure availability. St. John Decl. ¶¶ 29-31, Wolf Decl. ¶¶ 38, 46.

At Florence, there is no way to schedule legal phone calls at all. St. John Decl. ¶ 16; Wolf Decl. ¶ 45. The only way for Plaintiffs to communicate with Detained Clients at Florence over the phone is to leave a message with the facility in a general voicemail box or to send an email to the facility, at least 24 hours in advance of the desired time for the client to call the attorney from a recorded, public pay phone in the housing unit. St. John Decl. ¶ 17. This message delivery system is unreliable, and FIRRP attorneys must often leave several messages over the span of many days before a client returns their call, often not at the requested time. St. John Decl. ¶¶ 17-18.

At Laredo, there is no reliable scheduling system in place. Instead, attorneys must often make repeated calls to the facility to request a legal phone call, or to ask the facility to pass a message to Detained Clients to call counsel at a specified time on a pro bono hotline. Hidalgo Decl. ¶¶ 18-19. At Krome, there is no mechanism for scheduling calls. Wolf Decl. ¶ 39, Jacoski Decl. ¶ 10. Attorneys have reported that phone calls requesting to schedule calls with Detained Clients have gone unreturned, or if a response is received, it is days or weeks later. Wolf Decl. ¶ 42. At River, information regarding the scheduling system is not publicly available, nor does the system for scheduling calls function. *Id*. ¶ 38.

*Phone Calls are Not Free*. Detained clients must generally pay to call counsel, which limits attorney-client communication. While pro bono platforms that allow Detained Clients to contact certain non-profit legal organizations free of charge exist at some of the facilities, the current pro bono platforms at Florence and Krome are functionally impossible to use, so Detained Clients are forced to use paid platforms. At Florence, charges for calls to an attorney can cost up to $.11 per minute (approximately $10 for a 90-minute phone call), which few Detained Clients can afford. St. John Decl. ¶ 23. At Krome, Detained Clients can only contact their attorneys if they call their attorneys directly on the paid line or via a pro bono line. Jacoski Decl. ¶ 15. At both Florence and

Krome, the free pro bono hotlines are not viable alternatives for Detained Clients to communicate with their attorneys because they involve burdensome processes where the Detained Client must enter numerous, lengthy numerical codes to successfully place a call, and the complex instructions on how to place these calls are not accessible from the phone's location. St. John Decl. ¶ 25; Jacoski Decl. ¶ 18. These barriers, among others, make use of pro bono hotlines close to impossible. Jacoski Decl. ¶ 25; Lehner Decl. ¶ 9.

*Unreasonable Time Limits*. Defendants have placed an unreasonable 15-minute time limit on phone calls between Detained Clients and Plaintiffs at Laredo, which prevents Plaintiffs and Detained Clients from effectively communicating with each other, especially when interpreters are needed. Hidalgo Decl. ¶¶ 18, 22.

*Technical Issues Disrupt Phone Calls*. Defendants have also failed to ensure Detained Clients have access to functioning telephones. At Krome, Florence, and River, calls with Plaintiffs are sometimes cut short or interrupted because of high demand, routine headcounts, scheduled mealtimes, and/or poor audio connections. Jacoski Decl. ¶ 24; Lehner Decl. ¶ 16; St. John Decl. ¶¶ 20-21; López Decl. ¶ 33.

### 2. Defendants Restrict Access to Reliable, Confidential In-Person Attorney-Client Visits at the Four Detention Facilities.

Defendants fail to ensure means for reliable and confidential in-person communication between Plaintiffs and Detained Clients by (i) failing to provide a sufficient number of private rooms (or, in some cases, any private rooms at all); (ii) imposing unreasonable scheduling requirements and visiting hours, which lead to lengthy wait times; (iii) failing to provide or allow for interpretation services during visits; and (iv) impeding attorneys' ability to draft documents and filings during in-person meetings.

*Lack of Private Spaces for In-Person Meetings.* In-person visits require confidential meeting spaces to protect attorney-client privilege, and to ensure privacy for clients to feel comfortable sharing personal or sensitive information that is often critical to their cases. Each of the Four Detention Facilities lacks sufficient private areas to conduct confidential in-person visits between Detained Clients and Plaintiffs. For example, ISLA attorneys are unable to conduct confidential in-person visits at River. Instead, ISLA attorneys must communicate with Detained Clients in an open, heavily trafficked area, within earshot of ISLA's other waiting clients and facility guards who regularly pass through. López Decl. ¶¶ 10, 16-18.

Although Laredo, Florence, and Krome have some attorney visitation rooms, they are inadequate. Florence has only three or four private attorney visitation rooms, while ICE maintains capacity for 450 to 1,000 people at the facility, and there are thousands of additional people held in U.S. Marshals Service custody in the same correctional complex. St. John Decl. ¶¶ 9, 44. Similarly, Laredo has only two attorney visitation rooms for a facility with a maximum capacity of over 400 people. Hildalgo Decl. ¶ 32. The walls of the two rooms are so thin that sound freely passes between them and the immediately adjacent waiting room. Hidalgo Decl. ¶¶ 33.

Krome has only six private in-person contact visitation rooms for a facility with capacity to hold 682 people.[23] Jacoski Decl. ¶ 31. While Krome also offers one additional non-contact visitation room and 26 no-contact visitation booths, conversations in these spaces are monitored, are not private, and have poor acoustic and room design, which often prevents AIJ attorneys from being able to take notes or communicate effectively. Jacoski Decl. ¶¶ 34-35.

---

[23] A "contact" room enables communicate without a physical barrier, and is preferred because it permits clear communication and document exchange.

*Restricted Access to Interpreters*. Defendants also obstruct access to interpreters during in-person legal visits. Although interpreters are necessary when an attorney and client do not speak the same language, access to interpreters is effectively foreclosed during in-person attorney-client meetings at Florence, Laredo, and Krome. St. John Decl. ¶¶ 11, 43, 45; Hidalgo Decl. ¶ 34; Jacoski Decl. ¶ 37. Contacting an interpreter over the phone during in-person attorney-client visits is often the only way to bridge the language barrier, but at Laredo and Krome, there are no telephones available in the visitation rooms and lawyers are not allowed to access their cellphones. Hidalgo Decl. ¶ 34; Jacoski Decl. ¶ 37. Similarly, at Florence, Plaintiffs cannot use private telephones to contact interpreters during in-person legal visits. St. John Decl. ¶ 43. Instead, there is one phone, kept at a guard's desk, available upon request for attorneys who require telephonic interpretation, and is used at the visitation tables, rendering confidential communication impossible. Even if telephones were permitted inside the few private visitation rooms at Florence, attorneys and their clients are separated by a plexiglass wall and must speak through a closed-circuit phone, rendering telephonic interpretation functionally impossible. St. John Decl. ¶ 45.

Given the lack of access to telephonic interpretation, attorneys must arrange for interpreters to travel in person to the Four Detention Facilities. The interpreter approval process can be lengthy. For example, it can take between six months and one year at Laredo, and weeks at Krome. Hidalgo Decl. ¶ 34; Jacoski Decl. ¶ 37.

*Lack of In-Person Access to Technology*. Plaintiffs' attorneys are barred from using technology such as laptops, printers, and/or cell phones, during in-person legal visits. López Decl. ¶ 21; Jacoski Decl. ¶ 39; St. John Decl. ¶ 11 (Florence—laptops permitted); Hidalgo Decl. ¶ 33. Plaintiffs' attorneys are thus generally unable to draft or edit documents during their in-person

visits. Instead, Plaintiffs' attorneys must make several lengthy trips to detention facilities with prepared documents in hand to refine drafts or obtain client signatures.

### 3. Defendants Restrict Access to Free, Confidential VTC Attorney-Client Visits at the Four Detention Facilities.

Defendants also fail to provide free, confidential VTC access to Detained Clients at Florence, Krome, and Laredo. St. John Decl. ¶ 11; Jacoski Decl. ¶ 9; Hidalgo Decl. ¶ 15. Although VTC has recently been made available at River, there is no publicly available information about VTC access for attorney-client visits. López Decl. ¶ 34; Wolf Decl. ¶ 38. Confidential VTC is essential to attorney-client communication, because many ICE detention facilities are located in geographically isolated areas. Face-to-face communications between attorneys and clients—even if only virtual—are important for building relationships, evaluating the physical and mental state of clients, and sharing documents and reviewing visual evidence. St. John Decl. ¶¶ 52; Hidalgo Decl. ¶ 16; Jacoski ¶ 26.

### 4. Defendants Restrict Plaintiffs and Detained Clients at the Four Detention Facilities from Sending and Receiving Legal Documents.

The timely exchange of legal documents with clients is necessary to effective legal representation. Attorneys must be able to send documents for detained clients to review and sign, including declarations, forms, or other legal filings. Defendants, however, do not permit the use of widely available methods to timely exchange legal documents, such as fax and email, at any of the Four Detention Facilities. St. John Decl. ¶ 46; Jacoski Decl. ¶ 40; Hidalgo Decl. ¶¶ 30-31; López Decl. ¶¶ 26-29. These policies are more restrictive than those at other ICE detention facilities, Hidalgo Decl. ¶¶ 30-31, and conditions in nearby criminal facilities. Blanchard Decl. ¶¶ 15; Declaration of Javier Maldonado ("Maldonado Decl.") ¶ 6.

As a result, Plaintiffs and Detained Clients must rely on mail or courier delivery to exchange legal documents and obtain signatures. Mail and courier delivery service, however, are

slow, often taking several days, as a result of both the U.S. postal system *and* Defendants' failures to timely deliver mail or packages to Detained Clients once received at the facility. St. John Decl. ¶¶ 47-48; Hidalgo Decl. ¶ 29; Jacoski Decl. ¶¶ 41-43. This is particularly problematic in fast-paced proceedings, where Plaintiffs cannot wait several days to obtain a Detained Client's signature. Due to these delays and lack of email and fax, Plaintiffs' attorneys must drive to the facilities to exchange legal documents. López Decl. ¶¶ 10, 25.

### 5. Defendants Fail to Make Reasonable Accommodations for FIRRP and AIJ's Clients with Disabilities at Florence and Krome.

At Florence and Krome, FIRRP and AIJ attorneys represent individuals with serious mental health conditions who are unable to effectively access counsel without accommodations. These individuals ("Detained Clients with Disabilities") include people who have been determined by a qualified mental health provider[24] to have a serious mental disorder or condition.[25] FIRRP and AIJ's Detained Clients with Disabilities at Florence and Krome experience greater obstacles to attorney access than other Detained Clients because they face unique barriers due to their

---

[24] "Qualified mental health provider" is defined as "currently and appropriately licensed psychiatrists, physicians, physician assistants, psychologists, clinical social workers, licensed nurse practitioners, and registered nurses." *Franco-Gonzalez v. Holder*, No. 10-02211, 2014 WL 5475097, at *3 (C.D. Cal. Oct. 29, 2014).

[25] "Serious mental disorder or condition" means "a mental disorder that is causing serious limitations in communication, memory or general mental and/or intellectual functioning (*e.g.* communicating, reasoning, conducting activities of daily living, social skills); or a severe medical condition(s) (*e.g.* traumatic brain injury or dementia) that is significantly impairing mental function; or [exhibition of] one or more of the following active psychiatric symptoms or behavior: severe disorganization, active hallucinations or delusions, mania, catatonia, severe depressive symptoms, suicidal ideation and/or behavior, marked anxiety or impulsivity[;] . . . or significant symptoms of Psychosis or Psychotic Disorder; Bipolar Disorder; Schizophrenia or Schizoaffective Disorder; Major Depressive Disorder with Psychotic Features; Dementia and/or a Neurocognitive Disorder; or Intellectual Development Disorder (moderate, severe, or profound)." *Franco-Gonzalez*, 2014 WL 5475097, at *3 (defining term for immigrants in detention).

disabilities and because they experience greater challenges resulting from attorney access restrictions detailed above. Declaration of Dr. Pablo Stewart ("Stewart Decl.") ¶ 13.

At Florence, FIRRP represents Detained Clients with Disabilities, including those who qualify for the National Qualified Representative Program ("NQRP").[26] St. John Decl. ¶ 50, 56. At Florence, Detained Clients with Disabilities face distinct challenges with the message relay and call-back system for telephonic communication because they are generally unable to navigate the telephone system effectively without assistance, which is not provided. *Id*. ¶ 52; Stewart Decl. ¶¶ 8-12. A significant number of Detained Clients with Disabilities experience suicidal ideation as a result of their disabilities, which often results in placement into medical or mental health observation/segregation in conditions akin to solitary confinement, where there is sharply limited or no access to telephones. St. John Decl. ¶ 54. The rate at which clients with disabilities "refuse" in-person visits is much higher at Florence than at other facilities, and Florence lacks clearly established procedures to allow in-person access to counsel for individuals who are in medical/mental health observation or segregation. *Id*. ¶¶ 53, 55. Detained Clients with Disabilities at Florence face prolonged periods in mental health segregation, resulting in a total loss of access to counsel for weeks. *Id*. ¶ 55. Defendants have also failed to consistently provide accommodations at Florence, such as permission to see Detained Clients with Disabilities in the medical unit, facility transfers, or scheduled and facilitated phone calls, despite requests from FIRRP. *Id*. ¶ 56. In a recent case, it took nearly a month of advocacy and visitation attempts before FIRRP was able to meet with a client on mental health watch. The attorney had to obtain separate approval from ICE

---

[26] Lee Decl. Ex. P, U.S. Dep't of Justice, *National Qualified Representative Program* (NQRP), https://bit.ly/3z3nICN (last visited Oct. 13, 2022) (providing free, appointed representation to those found by an immigration judge or the Board of Immigration Appeals to be mentally incompetent to represent themselves in immigration proceedings).

to meet with her client, outside of the normal visitation scheduling process, and even then, had to push detention staff to actually bring her client to the legal visit. *Id*.

At Krome, AIJ regularly represents Detained Clients with Disabilities who are held in the Krome Behavioral Health Unit ("KBHU"), a unit specifically designated by ICE for the detention of people with severe mental illness from jurisdictions nationwide, as well as in other areas of the facility, including the Medical Housing Unit ("MHU"), solitary confinement, and general population units. Jacoski Decl. ¶¶ 46, 51, 52.

Detained Clients with Disabilities at Krome face even greater challenges in attorney access than AIJ's other Detained Clients. AIJ's Detained Clients with Disabilities require more time to communicate and relay information as a result of their disabilities, and additional support to facilitate attorney-client communication. *Id*. ¶¶ 48, 50; Stewart Decl. ¶¶ 8-12. The lack of VTC access, which is important to establish rapport and assess competency, particularly hampers attorney access for Detained Clients with Disabilities. *Id*. ¶¶ 49; Stewart Decl. ¶ 11. The inability to have confidential legal calls is also especially detrimental to Detained Clients with Disabilities. *Id*. ¶¶ 49, 51. Detained Clients with Disabilities who are placed in solitary confinement at Krome are also cut off from access to telephone and paid messaging communications. *Id*. ¶ 55.

Plaintiffs FIRRP and AIJ have suffered concrete harm to their ability to communicate effectively with Detained Clients with Disabilities about matters crucial to legal representation. Due to attorney access barriers, FIRRP and AIJ must conduct nearly every meeting with its Detained Clients with Disabilities in person, and even these in-person meetings are delayed at Krome, or unreliable or not confidential at Florence. St. John Decl. ¶¶ 53, 55; Jacoski Decl. ¶¶ 32, 54-55. As a result, FIRRP and AIJ have been frustrated in their efforts to provide consistent, quality representation to their Detained Clients with Disabilities and have experienced lengthy periods

during which they have lacked access to clients. St. John Decl. ¶¶ 55, 58; Jacoski Decl. ¶¶ 50, 54, 56. Detained Clients with Disabilities have also suffered significantly without adequate means of communication with their attorneys. For example, these inconsistent communications have exacerbated clients' symptoms such as paranoid, persecutory, or delusional beliefs or feelings of hopelessness or isolation, and have undermined the development of a trusting attorney-client relationship. St. John Decl. ¶ 51; Jacoski Decl. ¶¶ 52-55. As a result of these barriers, AIJ has even had to turn away cases involving detained people with disabilities. Jacoski Decl. ¶ 48.

### III.    LEGAL STANDARD

To obtain preliminary injunctive relief, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). When seeking such relief, the movant bears the burden of showing that "all four factors, taken together, weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014).

Courts in this Circuit have traditionally applied these factors using a sliding scale framework, under which a stronger showing on one factor can compensate for a weaker showing on another. *See, e.g., Davenport v. Int'l Bhd. of Teamsters,* 166 F.3d 356, 360-61 (D.C. Cir. 1999). While some courts have suggested that a likelihood of success on the merits may be an "independent, free-standing requirement," the D.C. Circuit has not yet abandoned the sliding scale analysis. *Sherley v. Sebelius*, 644 F.3d 388, 392-93 (D.C. Cir. 2011) (quoting *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009)); *see also League of Women Voters of United States v. Newby,* 838 F.3d 1, 7 (D.C. Cir. 2016). Regardless of the approach, here, Plaintiffs have made the necessary "clear showing" on all four factors such that a preliminary injunction in their favor on the claims detailed below is warranted. *Winter*, 555 U.S. at 22.

# IV.    ARGUMENT

## A.    Plaintiffs Have Third-Party Standing to Bring Claims on Behalf of Detained Clients.

Plaintiffs satisfy the requirements of third-party standing to bring these claims on behalf of Detained Clients. To establish third-party standing, a plaintiff must demonstrate (1) "an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute," (2) "a close relation to the third party," and (3) "some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 411 (1991) (citation omitted). "In the context of a preliminary injunction motion, the plaintiff must show a substantial likelihood of standing under the heightened standard for evaluating a motion for summary judgment." *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 18 (D.D.C. 2020) (internal quotation marks and citation omitted). Here, Plaintiffs have "set forth by affidavit or other evidence specific facts that, if taken to be true, demonstrate a substantial likelihood of standing." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017) (internal quotation marks and citation omitted).

Each Plaintiff has suffered the requisite injury. Courts apply a "two-part inquiry" to determine whether organizational plaintiffs have suffered an injury in fact: "we ask, first, whether the agency's [(defendant's)] action or omission to act injured the [organization's] interest and, second, whether the organization used its resources to counteract that harm." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (internal quotation marks and citation omitted) (second alteration in original). To show that the defendant's conduct injured the organization's interest, "an organization must allege that the defendant's conduct 'perceptibly impaired' the organization's ability to provide services." *Turlock Irr. Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015). "An organization's ability to provide services has been perceptibly impaired when the

defendant's conduct causes an 'inhibition of [the organization's] daily operations.'" *Food & Water Watch, Inc.*, 808 F.3d at 919 (citation omitted).

Each Plaintiff dedicates its resources to providing legal representation for Detained Clients. FIRRP, ISLA, RAICES, and AIJ provide direct legal services and IJC recruits, supervises, and trains volunteer attorneys to represent detained immigrants pro bono at the Four Detention Facilities. St. John Decl. ¶ 3; López Decl. ¶ 4; Hidalgo Decl. ¶ 5; Wolf Decl. ¶¶ 6-9, 16-19. Defendants' restrictions on attorney-client access at the Four Detention Facilities have "inhibit[ed] the organization[s'] daily operations" by interfering with their abilities to provide legal services to Detained Clients. *Freedom Watch, Inc. v. McAleenan*, 442 F. Supp. 3d 180, 188 (D.D.C. 2020) (internal quotation marks and citation omitted).

FIRRP, ISLA, and RAICES estimate that the access-to-counsel barriers have forced them to expend up to twice the amount of time they otherwise would need to spend to represent their clients and thus have decreased the number of clients they can represent. St. John Decl. ¶ 13; López Decl. ¶ 38; Hidalgo Decl. ¶ 10. Similarly, for AIJ, attorney-access constraints have significantly impaired its ability to represent clients by lengthening the time it takes to prepare for a case. Lehner Decl. ¶ 11. Defendants' restrictions on attorney-client access have impeded IJC's daily operations by requiring IJC to spend significantly more time providing one-on-one mentorship and advice to volunteer attorneys with clients at the Four Detention Facilities. Wolf Decl. ¶¶ 31-33, 50.

Plaintiffs have also "used [their] resources to counteract [the] harm" Defendants' access-to-counsel restrictions have imposed on their daily operations. *Food & Water Watch, Inc.*, 808 F.3d at 919. An organizational plaintiff "must show that it expended resources — beyond those normally carried out to advance [its] mission and excluding 'self-inflicted' expenditures — to address th[e] impairment." *Citizens for Resp. & Ethics in Wash. v. U.S. Off. of Special Couns.*, No.

19-3757, 480 F. Supp. 3d 118, 128 (D.D.C. Aug. 6, 2020). Here, FIRRP has diverted significant resources to maintain hotline hours with dedicated staff designated to answer calls because of telephone restrictions at Florence. St. John Decl. ¶ 33. The access barriers at Krome have required AIJ to expend more resources than usually required because "they compelled [AIJ] to solicit and train local law students and other organizations located closer to Krome." Lehner Decl. ¶ 24. According to ISLA's estimates, "the attorney-client communication barriers at River cause ISLA to expend on average $1,080 in additional resources per month for a single case at River, including expenses such as renting cars and paying for gas for the six-hour drives to and from the office to the facility." López Decl. ¶ 11. For RAICES, the additional resources needed at Laredo, requiring "double the time and resources" than "at any other detention center," were so "onerous" that it had to pause taking new cases there. Hidalgo Decl. ¶¶ 10, 14-15. IJC explained that it is required to expend more resources on "individualized assistance just to [help volunteer attorneys] gain access to their clients." Wolf Decl. ¶ 32.

Plaintiffs also satisfy the "close relationship" requirement because they each share an "identity of interests" with Detained Clients "such that [Plaintiffs] will act as [] effective advocate[s] of [Detained Clients'] interests." *Lepelletier v. FDIC*, 164 F.3d 37, 44 (D.C. Cir. 1999). "[C]onfidential or contractual relationships, for example, those between . . . attorneys and clients . . . have most often been found to support third-party standing." *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 361 (D.D.C. 2020). Detained Clients are existing or prospective clients of FIRRP, ISLA, AIJ, and RAICES, with which they possess a "confidential" attorney-client relationship. *See* St. John Decl. ¶ 3; López Decl. ¶ 4; Hidalgo Decl. ¶ 5. Although IJC does not have a direct attorney-client relationship with Detained Clients, "neither the Supreme Court nor the D.C. Circuit has ever 'required' such a relationship." *Turner*, 502 F. Supp. 3d at 361. IJC

satisfies the crux of the "close relationship" requirement because it has "an identity of interests" with Detained Clients such that it "will act as an effective advocate of" their interests. *Lepelletier*, 164 F.3d at 44. IJC shares Detained Clients' interest in fair opportunities to be heard and IJC's mission to increase access to counsel for the benefit of Detained Clients, particularly in geographically isolated locations. Wolf Decl. ¶¶ 5-6, 26.

Finally, Detained Clients face significant "hindrance[s] to [their] ability to protect [their] own interests." *Powers*, 499 U.S. at 411. The hindrance prong "does not require an absolute bar from suit, but some hindrance to the third party's ability to protect his or her own interests." *S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec.* (*SPLC v. DHS*), No. 18-760, 2020 WL 3265533, at *14 (D.D.C. June 17, 2020) (internal quotation marks and citation omitted). Detained Clients face obstacles to bringing such a suit on their own, including language barriers, limited understanding of the U.S. legal system, inadequate access to legal resources, and fear of retaliation. Hidalgo Decl. ¶ 13; Wolf Decl. ¶ 30; López Decl. ¶ 40; St. John Decl. ¶ 15; Lehner Decl. ¶ 28. Moreover, the same access-to-counsel barriers that form the subject of this action serve as obstacles restricting Detained Clients' ability to litigate as first parties. Detained Clients' claims are also subject to mootness due to the risk that Detained Clients may be released from detention or deported before their claims are adjudicated, and "'[i]mminent mootness' is one of various obstacles that may warrant third-party standing." *SPLC*, 2020 WL 3265533, at *14 (quoting *Singleton v. Wulff*, 428 U.S. 106, 117 (1976)). These substantial barriers impede Detained Clients' ability to protect their own interests, justifying Plaintiffs litigating on their behalf.

    **B.**    **Plaintiffs Are Likely to Succeed on the Merits of Detained Clients' Fifth Amendment Claims.**

        **1.**    **Defendants' Restrictions on Adequate Access to Counsel Constitutes Punishment in Violation of Detained Clients' Substantive Due Process Rights.**

Defendants' restrictions on access to counsel impermissibly punish Detained Clients at the Four Detention Facilities, in violation of their Fifth Amendment right to substantive due process. Immigration detention is civil in nature. *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 187 (D.D.C. 2015). Because Detained Clients are persons subject to civil immigration detention, they cannot be subjected to conditions that constitute punishment, and are entitled to more considerate treatment than those in criminal custody. *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982); *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

A person subject to civil detention can prevail in showing that a challenged condition constitutes punishment by showing "that a restriction is objectively unreasonable or excessive relative to the Government's proffered justification." *SPLC*, 2020 WL 3265533, at *18. To determine whether a condition or restriction is "reasonably related to a legitimate governmental objective," the court considers whether the conditions are "employed to achieve objectives that could be accomplished in so many alternative and less harsh methods." *Id.* (internal citations and quotations omitted). Where civil detainees face conditions that are "not more considerate than those at pretrial and prison facilities," such conditions "may be punitive in nature and may therefore violate the substantive due process clause." *Id.* at *19 (quoting *Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1065 (C.D. Cal. 2019)).

Defendants' restrictions on access to counsel at the Four Detention Facilities impermissibly punish Detained Clients because these restrictions are not reasonably related to a legitimate governmental objective. Current restrictions on attorney-client communication at the Four Detention Facilities bear no reasonable relation to the government's interest in operational security and facility management, nor to its interest in ensuring attendance at immigration proceedings or reducing danger to the community. *See Torres,* 411 F. Supp. 3d at 1064 (describing potential

government justifications for access-to-counsel restrictions); *R.I.L-R*, 80 F. Supp. 3d at 188 (describing government interest in detention). Many of the attorney-access measures sought by Plaintiffs are already required by ICE's own detention standards. *See supra* Part II.B. Other immigration detention facilities have implemented these measures, demonstrating that they can be successfully implemented while accounting for security and facility management interests. Indeed, staff at Florence themselves planned to implement programs such as scheduled attorney phone calls to improve facility operations and efficiency, only to have those plans canceled by an ICE official. St. John Decl. ¶¶ 37-39.

It is also clear that Defendants could easily employ the "alternative and less-harsh methods" requested by Plaintiffs to provide access to counsel. *SPLC,* 2020 WL 3265533, at *18. First, attorney access conditions at the Four Detention Facilities fall short of requirements outlined in ICE's own detention standards, which "offer an example of less restrictive alternative means." *Torres*, 411 F. Supp. 3d at 1065.[27] Second, it is clear that other ICE detention centers employ alternative and less-harsh methods to ensure access to counsel. For example, at least 37 ICE

---

[27] *See, e.g*., Lee Decl. Ex. F, 2008 PBNDS § 5.31(V)(F)(2) (requiring all facilities to "ensure privacy" of legal calls), Ex. G, 2011 PBNDS § 5.6(V)(F)(2) (same), Ex. E, 2019 NDS § 5.4(II)(J) (same); Ex. F, 2008 PBNDS § 5.32(V)(J)(9) (requiring "[p]rivate consultation rooms" for legal visits), Ex. G, 2011 PBNDS § 5.7(V)(J)(9) (same), Ex. E, 2019 NDS § 5.5(II)(G)(8) (same); Ex. F, 2008 PBNDS § 5.32(V)(J)(3)(c) (requiring all facilities to permit interpreters in legal visits), Ex. G, 2011 PBNDS § 5.7(V)(J)(3)(c) (same), Ex. E, 2019 NDS § 5.5II(G)(3)(c) (same); Ex. G, 2011 PBNDS § 5.7(V)(J)(10) (requiring facilities to provide for exchange of documents, even when contact visitation rooms are unavailable); Ex. F, 2008 PBDNS § 5.31(II) (requiring that facility telephone procedures foster legal access), Ex. G, 2011 PBNDS at 5.6(II) (same); Ex. F, 2008 PBNDS § 5.31(V)(J) (requiring message delivery no less than 3 times a day); Ex. G, 2011 PBNDS § 5.6(V)(J) (requiring delivery of messages "as promptly as possible"); Ex. E, 2019 NDS § 5.4(II)(I) (requiring message delivery within 8 hours); Ex. F, 2008 PBNDS § 5.31(V)(F)(1) (specifying that time limits on phone calls be no shorter than 20 minutes), Ex. G, 2011 PBNDS § 5.6(V)(F)(1) (same), Ex. E, 2019 NDS § 5.4(II)(F) (same); Ex. F, 2008 PBNDS § 5.26(V)(G)(2) (requiring confidentiality of legal mail), Ex. G, 2011 PBNDS § 5.1(V)(G)(2) (same), Ex. E, 2019 NDS § 5.1(II)(E)(2) (same).

detention facilities currently allow attorneys to schedule legal calls in advance.[28] ICE touts its national Virtual Attorney Visitation Program, which currently provides for free, private, and unmonitored VTC visits at 25 ICE detention facilities across the country.[29] *See also* Lehner Decl. ¶ 17 (explaining that other ICE facilities in Florida offer VTC legal visits). Forty-five immigration detention facilities nationwide provide contact visits for attorneys, 98 facilities currently allow attorneys to use their laptops, and at least 37 allow cell phones in legal visits.[30] Other nearby immigration detention facilities provide for the exchange of legal documents by fax or email. López Decl. ¶¶ 21, 28 (noting that other Louisiana ICE detention facilities allow laptops in legal visits and access to fax machines for legal document exchange); Hidalgo Decl. ¶¶ 30-31 (identifying other ICE facilities in Texas that allow for the use of fax or email).

In fact, in response to other litigation, ICE has agreed to many of the measures Plaintiffs request here, making clear that "less restrictive alternative means" are available. In a case challenging attorney telephone access at detention facilities in California, ICE entered into a settlement agreement that provided a host of protections, including (a) extension or elimination of automatic call cut-offs, (b) the construction of private phone booths, (c) access to a private phone room designated for legal calls that may be scheduled in advance, (d) three-way calling to accommodate interpreters, and (e) a requirement that each facility have at least one designated telephone access facilitator available during business hours. Settlement Agreement and Release, *Lyon v. ICE*, No. 3:13-cv-05878 (N.D. Cal. June 13, 2016), ECF No. 262, https://bit.ly/3VJSE4M. Similarly, ICE entered into a settlement agreement to improve access at LaSalle ICE Processing

---

[28] Lee Decl. Ex. Q, ACLU, *No Fighting Chance: ICE's Denial of Access to Counsel in U.S. Immigration Detention Centers* 15 (2022), https://bit.ly/3shsrgv.
[29] Lee Decl. Ex. R, ICE, Virtual Attorney Visitation, (last updated Nov. 7, 2022), https://www.ice.gov/detain/attorney-information-resources.
[30] Lee Decl. Ex. Q, ACLU, *No Fighting Chance* at 25, 27, *supra* note 28.

Center in Jena, Louisiana, that required, *inter alia*, (a) the construction of private rooms for telephone calls that allow for three-way calling and for in-person visits, (b) the availability of scheduled legal calls and visits, and (c) that confidential legal calls not be limited to less than two hours. Settlement Agreement on Pl.'s Mot. for Prelim. Inj. re: the LaSalle ICE Processing Ctr., *SPLC*, No. 18-0760 (D.D.C. Sept. 5, 2018), ECF No. 42.

Courts have likewise ordered similar remedial measures. *See Torres v. U.S. Dep't of Homeland Sec.*, No. 18-2604, 2020 WL 3124216 (C.D. Cal. Apr. 11, 2020); *Torres v. U.S. Dep't of Homeland Sec.*, No. 18-2604, 2020 WL 3124305, at *2 (C.D. Cal. Apr. 24, 2020) (requiring defendants to implement policies permitting detained clients to schedule unrecorded, unmonitored, and free calls); *SPLC*, 2020 WL 3265533, at *34-35 (ordering clear written procedures for scheduling telephone and VTC calls and electronic means for confidentially sharing documents).

Finally, it is clear that attorney access conditions at the Four Detention Facilities are "not more considerate than those at pretrial and prison facilities." *SPLC*, 2020 WL 3265533, at *19. Nearby jails and criminal pretrial detention facilities often provide better attorney access, specifically with respect to telephones, VTC, in-person visitation, and exchange of documents than the Four Detention Facilities. For example, nearby U.S. Marshals Service (USMS) facilities that hold people in pre-trial criminal detention allow attorneys to schedule free, confidential, unmonitored legal phone calls with their clients. Blanchard Decl. ¶¶ 12, 14 (certain USMS facilities in Louisiana); Maldonado Decl. ¶ 4 (USMS facility in Texas). Neighboring USMS facilities and local jails also provide free, confidential, unmonitored, and scheduled VTC calls. Blanchard Decl. ¶¶ 10-11 (certain USMS facilities in Louisiana); Botello Decl. ¶¶ 11-12 (USMS facility in Arizona); Tibbett Decl. ¶¶ 11-15 (certain criminal detention centers in Florida). Indeed,

legal VTC is available to people in USMS custody at Florence, even as it is denied to Detained Clients there. St. John Decl. ¶ 40.

Likewise, conditions for in-person attorney visits at many jails and USMS facilities exceed those at the Four Detention Facilities. Neighboring USMS facilities and jails provide private spaces for confidential, in-person, attorney-client "contact" visits, without lengthy waits. Botello Decl. ¶¶ 7-10; Blanchard Decl. ¶¶ 4-9; Maldonado Decl. ¶5; Tibbett Decl. ¶¶ 4-7, 10. Nearby jails and USMS facilities also provide attorneys and their clients with superior methods to quickly exchange legal documents, including by email, fax, or reliable mail delivery. Blanchard Decl. ¶¶ 15-16; Maldonado Decl. ¶ 6; Botello Decl. ¶ 16. At the Central Arizona Detention Center, which detains people in federal criminal pre-trial custody and is managed together with Florence at the same correctional complex,[31] attorneys may have private meetings with clients in medical, mental health and segregation units, and arrange for lengthy evaluations by retained experts. Botello Decl. ¶¶ 7-10. Defendants' restrictions on access to counsel at the Four Detention Facilities thus constitute punishment of Detained Clients, all of whom are civil detainees.

> **2.    Defendants' Restrictions on Adequate Access to Counsel at the Four Detention Facilities Deprive Detained Clients of Their Due Process Right to a Full and Fair Custody Proceeding.**

Defendants' restrictions on access to counsel at the Four Detention Facilities violate Detained Clients' due process right to a fundamentally fair bond hearing or similar custody proceeding seeking release from detention. The Fifth Amendment's Due Process Clause provides that the federal government may not deprive *any person*, including noncitizens in immigration

---

[31] Lee Decl. Ex. S, The Nakamoto Group, Inc., *Annual Inspection of the CCA Florence Correctional Center* 2 (Aug. 26, 2021), https://bit.ly/3Djq8jj ("Originally constructed in 1999 and operated as two facilities, the Central Arizona Detention Center (west compound) and the Florence Correctional Center (east compound) were merged in 2017 as the Central Arizona Florence Correctional Complex").

detention, of "liberty . . . without due process of law." U.S. Const. Amend. V; *see also Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976) (noting that "[e]ven one whose presence in this country is unlawful, involuntary, or transitory is entitled" to protection under the Fifth Amendment "from deprivation of life, liberty, or property without due process of law").

"A procedural due process violation occurs when an official deprives an individual of a liberty or property interest without providing appropriate procedural protections." *Atherton v. D.C. Off. of Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009). Obtaining freedom from detention is a quintessential liberty interest that applies to Detained Clients. "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). People in immigration detention possess a liberty interest protected by the Due Process Clause. *See, e.g.*, *Zadvydas*, 533 U.S. at 694-95; *R.I.L-R*, 80 F. Supp. 3d 164, 187–88 (D.D.C. 2015). Moreover, the Immigration and Nationality Act entitles immigrants who are discretionarily detained to request a hearing before an immigration judge, at which they may be issued bond or conditional parole. *See* 8 U.S.C. §§ 1226(a)(2)(A)-(B); 8 C.F.R. § 236.1(d)(1). Although immigrants held in mandatory detention lack the same right to request a bond hearing, they have the right to challenge whether they are properly subject to mandatory detention and to file a habeas petition in federal court contesting their detention. *See Demore v. Kim*, 538 U.S. 510, 526-31 (2003).

The restrictions on access to counsel at the Four Detention Facilities deprive Detained Clients of a meaningful opportunity to be heard, "[a] fundamental requirement of due process." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). Specifically, Defendants' restrictions deny

Detained Clients access to full and fair hearings to seek bond or conditional parole, or other proceedings seeking release from detention, such as habeas review.

Courts apply the three-prong test established in *Mathews v. Eldridge*, 424 U.S. 319 (1976), to determine what safeguards the Due Process Clause requires to make a civil proceeding "fundamentally fair." *Turner v. Rogers*, 564 U.S. 431, 444 (2011). The *Mathews* factors are:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335. All three factors weigh heavily in favor of requiring Defendants to provide Detained Clients adequate access to counsel.

Freedom from detention is one of the strongest types of private interests under the *Mathews* balancing test. The Supreme Court has long recognized that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987); *see also Turner*, 564 U.S. at 445. The fact that immigration detention is "civil" does not lessen the gravity of Detained Clients' liberty interest given that "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425 (1979). Similarly, Detained Clients' "lack of a legal right to 'live at large in this country'" fails to diminish their liberty interest, *Zadvydas*, 533 U.S. at 696, as courts have recognized that a detained immigrant's "interest in his freedom pending the conclusion of his removal proceedings deserves great 'weight and gravity.'" *Clerveaux v. Searls*, 397 F. Supp. 3d 299, 309 (W.D.N.Y. 2019).

Defendants' restrictions on access to counsel at the Four Detention Facilities create a high risk that Detained Clients will be denied a meaningful opportunity to be heard. Access to counsel is critical to avoid the erroneous deprivation of a detained immigrant's liberty; detained immigrants

are approximately seven times more likely to be released on bond when represented by counsel.[32] As described above, Detained Clients and their attorneys must have access to reliable means of confidential communication to timely and adequately prepare applications, requests, or petitions for release. Detained immigrants typically bear the burden of proving that they should be released on bond or parole because they are not a flight risk and do not pose a danger to the community.[33] They therefore need to develop and submit a factual record sufficient to satisfy their burden, including facts regarding their family ties and employment and immigration history, as well as medical and mental health conditions, which may require a psychiatric evaluation or consultation with a medical expert. Obtaining this information and developing a complete, accurate record requires timely, reliable, and confidential attorney access to avoid missing deadlines and prolonging detention. In addition to the extensive factfinding required, determining a detained immigrant's eligibility for various options for release requires complex legal analysis, and no alternative safeguards can substitute for the assistance of an attorney trained in immigration law.[34] Adequate access to counsel would therefore substantially reduce the likelihood that Detained Clients will be erroneously deprived of their liberty.

Any "fiscal and administrative burdens" on the government are modest. *Mathews*, 424 U.S. at 335. First, Defendants may effectuate the changes Plaintiffs seek in a cost-effective manner;

---

[32] *See* Lee Decl. Ex. B, Eagly & Shafer, *supra* note 3, at 70.

[33] 8 C.F.R. § 1236.1(c)(8); *Johnson v. Arteaga-Martinez*, 142 S. Ct. 1827, 1833 (2022) (stating in dicta that detained people bear the burden of proof in seeking bond under 8 U.S.C. § 1226(a)); *Guerra*, 24 I. & N. Dec. at 37; *but see Hernandez-Lara v. Lyons*, 10 F.4th 19 (1st Cir. 2021).

[34] Lee Decl. Ex. T, Kerin Berberich & Nina Siulc, *Why Does Representation Matter? The Impact of Legal Representation in Immigration Court* (2018), https://bit.ly/3TyWITT ("Only 5 percent of cases that won between 2007 and 2012 did so without an attorney; 95 percent of successful cases were represented."); Ex. U, New York Immigrant Representation Study, *Accessing Justice: The Availability and Adequacy of Counsel in Immigration Proceedings* 3 (2011), https://bit.ly/3FdId3w ("The two most important variables affecting the ability to secure a successful outcome in a case . . . are having representation and being free from detention.").

Plaintiffs' requested remedies will not necessarily impose any expenditures or costs on Defendants. For example, providing sufficient access to private legal visits can be as simple as designating enough private rooms as "attorney-client visitation rooms" and permitting attorneys to send legal documents by commonly available methods such as fax or email. Similarly, some of the Four Detention Facilities already have the now-ubiquitous technology and infrastructure for VTC. St. John Decl. ¶ 40.

Second, providing adequate access to counsel will serve the government's and the public's interest by preventing unnecessary prolonged detention. "[L]imiting the use of detention to only those noncitizens who are dangerous or a flight risk may save the government, and therefore the public, from expending substantial resources on needless detention." *Hernandez-Lara v. Lyons*, 10 F.4th at 33. Providing counsel for detained noncitizens would likely "pay for itself," in part because detained immigrants represented by counsel "would be more likely to secure release at the outset of removal proceedings through a successful bond hearing," saving the government the costs of extra time in detention.[35] *See also Velasco Lopez v. Decker*, 978 F.3d 842, 855 n.11 (2d Cir. 2020) ("Detention costs taxpayers approximately $134 per person, per day, according to ICE's estimates.").

On balance, Detained Clients' interest in freedom from detention, and the risk of erroneous deprivation of liberty, compared to the low fiscal and administrative burdens on the government, weigh in favor of requiring Defendants to cure attorney access restrictions.

### C.    Plaintiffs Are Likely to Succeed on the Merits of Their APA Claim.

---

[35] Lee Decl. Ex. V, John D. Montgomery, *Cost of Counsel in Immigration: Economic Analysis of Proposal Providing Public Counsel to Indigent Persons Subject to Immigration Removal Proceedings* 5, NERA Econ. Consulting (May 28, 2014),  https://bit.ly/3N6RxZ5.

Plaintiffs are also entitled to a preliminary injunction requiring Defendants to comply with their own Detention Standards.[36] Defendants' restrictions on attorney-client access at the Four Detention Facilities violate the Detention Standards' Attorney Access Provisions. Under the *Accardi* doctrine, "agencies may not violate their own rules and regulations to the prejudice of others." *Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005); *see United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). Defendants have done just that. Plaintiffs are likely to succeed on the merits of their claims that the Court should (1) compel Defendants' compliance with the Detention Standards as "agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1); and (2) "hold unlawful and set aside" Defendants' decision not to comply with their own standards, which is "arbitrary, capricious, . . . or otherwise not in accordance with the law," *id.* § 706(2)(A), and "contrary to constitutional right[s]," *id.* § 706(2)(B).

The Detention Standards are binding on Defendants under the *Accardi* doctrine, which holds that agency rules and regulations are legally binding, regardless of whether they are "formal regulations," "if so intended" by the agency, and when they are "promulgated for the protection of individuals." *Damus v. Nielsen*, 313 F. Supp. 3d 317, 336 (D.D.C. 2018) (citations omitted); *Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.").

Defendants have evinced an intent to be bound by the Detention Standards. *See Damus*, 313 F. Supp. 3d at 336 (courts assess "the substance and intent of the agency action, as well as whether it confers individual protections or privileges" in determining whether it is binding) (quoting *Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1985)). The Detention Standards are

---

[36] The Detention Standards fall short of constitutional requirements. Defendants' compliance with them is necessary but not sufficient to comply with their constitutional obligations.

facially mandatory: they repeatedly state that facilities "shall" or are "required" to adhere to the standards.[37] *See Moghaddam v. Pompeo*, 424 F. Supp. 3d 104, 120-21 (D.D.C. 2020) (determining agency intent under *Accardi* requires an examination of "mandatory language"); *O'Donnell v. U.S. Agency for Int'l Dev.*, No. 18-03126, 2019 WL 2745069, at *3 (D.D.C. July 1, 2019) ("shall" constitutes mandatory language). Defendants hold themselves out as acting to ensure compliance with the standards.[38] *See Aracely R. v. Nielsen*, 319 F. Supp. 3d 110, 151 (D.D.C. 2018) (granting preliminary injunction against ICE under *Accardi* where compliance analyses evinced intent to be bound by parole directive). Crucially, the Detention Standards also confer "individual protections" for Detained Clients by establishing standards for attorney access.

Defendants' failure to require compliance with the Attorney Access Provisions is "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1) (emphasis added). Defendants are failing to take action that is "legally required" and "discrete." *Norton v. S. Utah W. All.* (*SUWA*), 542 U.S. 55, 62-64 (2004) ("The APA provides relief for a failure to act in § 706(1)

---

[37] *See, e.g.*, Lee Decl. Ex. F, 2008 PBNDS § 5.26(V)(D) (using "shall" in provisions pertaining to correspondence), Ex. G, 2011 PBNDS §5.1(V)(D) (same), Ex. E, 2019 NDS § 5.1(II)(C) (same); Ex. F, 2008 PBNDS § 5.31(V)(D) (same, for telephone access), Ex. G, 2011 PBNDS § 5.6(V)(D) (same), Ex. E, 2019 NDS § 5.4(II)(A) (same); Ex. F, 2008 PBNDS § 5.32(V)(J) (same, for legal visitation), Ex. G, 2011 PBNDS § 5.7(V)(J) (same), Ex. E, 2019 NDS § 5.5(II)(G) (same); *see also* Lee Decl. Ex. W, ICE, *2008 Operations Manual ICE Performance-Based National Detention Standards* (last updated Feb. 18, 2022), https://bit.ly/3gDOUli (stating that the 2008 PBNDS prescribe "requirements"); Ex. G, 2011 PBNDS § 5.6(II), 5.7(II) (telephone access and attorney visitation provisions are "specific requirements"); Ex. X, ICE, *2019 National Detention Standards for Non-Dedicated Facilities* (last updated Feb. 18, 2022), https://bit.ly/3W0uHGB (the 2019 NDS focus on "essential requirements").

[38] *See* Lee Decl. Ex. Y, U.S. GAO, *Immigration Detention: Additional Actions Needed to Strengthen Management and Oversight of Facility Costs and Standards* 30, 35-40 (Oct. 2014), https://bit.ly/3f0wwTp (discussing ICE's mechanisms for assessing facilities' compliance with detention standards); Ex. Z, ICE, *Facility Inspections* (last updated Oct. 11, 2022), https://www.ice.gov/detain/facility-inspections (annual detention inspections ensure that facilities comply with ICE standards and that "any deficiencies noted are immediately resolved by facility management").

. . . where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required* to take."). Defendants are "legally required" to comply with the Attorney Access Provisions because they are binding, as discussed above, *See Moghaddam v. Pompeo*, 424 F. Supp. 3d 104, 121 (D.D.C. 2020) (plaintiffs stated *Accardi* claim under § 706(1) where Department of State violated its own binding guidance). Defendants' failure is "discrete" because the Attorney Access Provisions mandate "specific" actions that a court can "competently compel and supervise."[39] *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 20 (D.D.C. 2017).

Defendants have not only failed to require compliance with the Attorney Access Provisions, they have made an affirmative decision not to require compliance with them, which should be "h[e]ld unlawful and set aside" as "arbitrary, capricious, . . . or otherwise not in accordance with law" and "contrary to constitutional right[s]" under the APA. 5 U.S.C. § 706(2). *See Aracely*, 319 F. Supp. 3d at 150 ("Agency actions may be arbitrary and capricious when they do not comply with binding internal policies governing the rights of individuals."); *Sorto-Vasquez Kidd v. Mayorkas*, No. 20-03512, 2021 WL 1612087, at *9-10 (C.D. Cal. Apr. 26, 2021) (agency action in violation of *Accardi* and the Constitution was found actionable under the APA as "contrary to constitutional right[s]").

Defendants' decision not to require compliance with the Attorney Access Provisions constitutes final agency action redressable under Section 706(2). *See Torres*, 411 F. Supp. 3d at 1069 ("final agency action" found where plaintiffs alleged both "non-compliance" with PBNDS and "an agency decision"). Defendants' decision is final because (1) it marks the "consummation"

---

[39] *See, e.g.*, Lee Decl. Ex. F, 2008 PBNDS § 5.32(V)(J)(2) ("Each facility shall permit legal visitation seven days a week, including holidays, for a minimum of eight hours per day on regular business days . . . ."); *see generally* Lee Decl. Ex. F, 2008 PBNDS; Ex. G, 2011 PBNDS; Ex. E, 2019 NDS.

of a decision-making process, as opposed to being "tentative or interlocutory," and (2) it determines rights or obligations. *Bennett v. Spear,* 520 U.S. 154, 177-78 (1997). In assessing finality, courts take a "pragmatic" and "flexible" approach. *Abbott Labs v. Gardner*, 387 U.S. 136, 149, 150 (1967), *abrogated on other grounds* by *Califano v. Sanders*, 430 U.S. 99 (1977).

Plaintiffs meet both requirements for finality here. *First*, Defendants' non-enforcement of the Attorney Access Provisions reflects a "consummation" of their decision-making process, because it is "attributable to the agency itself and represents the culmination of [its] consideration of an issue." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020) (quoting *Bennett*, 520 U.S. at 177-78). Agency action is not interlocutory where an agency's continuous failure to act deprives individuals of legal rights. *See Immigrant Defs. L. Ctr. v. U.S. Dep't of Homeland Sec.*, No. 21-0395, 2021 WL 4295139, at *10 (C.D. Cal. July 27, 2021). ICE admitted earlier this year that it is not even monitoring—let alone requiring—compliance with the Attorney Access Provisions: ICE reported to Congress that it "does not track . . . the number of facilities that do not meet ICE standards for attorney/client communications."[40]

Defendants have not even required compliance with the Attorney Access Provisions following inspections of the Four Detention Facilities, which further demonstrates their decision not to enforce the Attorney Access Provisions. This year, Defendants did not bother to include in their inspections of Laredo and River *any* standards related to attorney access.[41] At Krome and Florence, Defendants did not inspect compliance with standards related to attorney visitation or

---

[40] Lee Decl. Ex. N, ICE, *Access to Due Process: Fiscal Year 2021 Report to Congress*, *supra* note 20, at 2.
[41] *See* Lee Decl. Ex. K, *River Inspection*, *supra* note 18, at 6; Lee Decl. Ex. J, *Laredo Inspection*, *supra* note 18, at 6.

mail and only partially inspected conditions related to telephone access.[42] Non-compliance with the Attorney Access Provisions following these inspections is "the result of an agency decision" not to require compliance with those provisions, and in some cases, not to even monitor compliance with them. *See Torres*, 411 F. Supp. 3d at 1068-69 (ICE failure to enforce attorney access-related provisions of 2011 PBNDS sufficiently alleged to be "agency decision"). This failure also amounts to a decision by Defendants not to enforce the terms of contracts with Florence, Laredo, and River, because the Detention Standards are incorporated therein.[43]

*Second*, Defendants' failure to ensure compliance with the Attorney Access Provisions determines "rights or obligations," *Bennett*, 520 U.S. at 178 (citation omitted), because it directly impacts Detained Clients' and Plaintiffs' rights and abilities to communicate. *See Torres*, 411 F. Supp. 3d at 1069 ("The Court assumes that the rights of detainees and obligations of detention contract facilities would flow from any agency action regarding detention standards compliance and enforcement."); *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.,* 637 F.3d 408, 412 (D.C. Cir. 2011) (finding final agency action where "immediate and significant burden" was imposed on regulated party).

### D.    Plaintiffs FIRRP and AIJ Are Likely to Succeed on the Merits of Their Claim Under Section 504 of the Rehabilitation Act.

Plaintiffs FIRRP and AIJ bring an additional claim under Section 504 of the Rehabilitation Act based on the discriminatory effects of the barriers on access to counsel on their Detained Clients with Disabilities. *See Tennessee v. Lane*, 541 U.S. 509, 526-27 (2004). FIRRP and AIJ

---

[42] The Krome inspection found no deficiencies, and the Florence inspection found no documentation for inspecting and logging telephones daily, but Part II.C, *supra*, demonstrates the widespread violations at these facilities. *See* Lee Decl. Ex. L, *Krome Inspection*, *supra* note 18, at 6; Ex. M, *Florence Inspection*, *supra* note 18, at 6, 18.

[43] *See supra* Part II.B.

bring this claim to remove the barriers that prevent their Detained Clients with Disabilities from communicating with attorneys, and sharing relevant facts in administrative and court proceedings.

Another court has found that the Rehabilitation Act protects the meaningful participation in immigration bond and parole hearings and conditions of confinement cases. That court recognized that certain detained immigrants' "ability to meaningfully participate in the immigration court process" is "hindered by their mental incompetency," and ordered that the government provide an attorney or other qualified representative to assist detained immigrants who required that accommodation in immigration court. *Franco-Gonzalez v. Holder*, No. 10-02211, 2013 WL 3674492, at *5, *9 (C.D. Cal. Apr. 23, 2013).[44] FIRRP and AIJ's Rehabilitation Act claim is a straightforward corollary to the right to a representative already found in *Franco-Gonzalez*: just as the government must provide a representative to people who require one to communicate their case to the immigration court, it must also provide other accommodations to people who require them to communicate with their legal representatives.

To prove a violation of Section 504 of the Rehabilitation Act, FIRRP and AIJ "must show that (1) [Detained Clients with Disabilities] are disabled within the meaning of the Rehabilitation Act, (2) they are otherwise qualified, (3) they were excluded from, denied the benefit of, or subject to discrimination under a program or activity, and (4) the program or activity is carried out by a federal executive agency or with federal funds." *Am. Council of the Blind v. Paulson,* 525 F.3d 1256, 1266 (D.C. Cir. 2008). Each of these four elements is satisfied here.

First, Detained Clients with Disabilities necessarily have disabilities within the meaning of the Rehabilitation Act. An individual is "disabled" "if she can show that she (1) 'has a physical or

---

[44] The definition of Detained Clients with Disabilities, or people who have been determined by a "qualified mental health provider" to have a "serious mental disorder or condition," is based in the court's enforcement order in *Franco-Gonzalez*. 2014 WL 5475097, at *2-3.

mental impairment which substantially limits one or more . . . major life activities,' (2) 'has a record of such an impairment,' or (3) 'is regarded as having such an impairment.'" *Adams v. Rice*, 531 F.3d 936, 943 (D.C. Cir. 2008) (quoting 29 U.S.C. § 705(20)(B)). Detained Clients with Disabilities, all of whom have been found by a qualified mental health provider to have a serious mental disorder or condition, meet these qualifications. *See Franco-Gonzalez*, 2013 WL 3674492, at *4 n.2; *supra* Part II.C.5 n.25 (defining "Detained Clients with Disabilities" with reference to terms defined for the *Franco-Gonzalez* class).

Second, Detained Clients with Disabilities are entitled to participate in communications with counsel. Defendants provide access to counsel as a service or benefit to all people in detention, including Detained Clients with Disabilities. *See Franco-Gonzalez*, 2013 WL 3674492, at *4 n.2.

Third, FIRRP and AIJ's Detained Clients with Disabilities face barriers to access to counsel "by reason of [their] disability" that exclude and deny them the benefits of attorney access, and subject them to discrimination. *Pierce v. Dist. Of Columbia*, 128 F. Supp. 3d 250, 267 (D.D.C. 2015). The Rehabilitation Act requires detention facilities to ensure that people with disabilities have equal access to means of communications. *See, e.g.*, *Rogers v. Colo. Dep't of Corr.*, No. 16-02733, 2019 WL 4464036, at *16 (D. Colo. Sept. 18, 2019) (requiring VTC as a reasonable accommodation under the Rehabilitation Act); *Niece v. Fitzner*, 922 F. Supp. 1208, 1219 (E.D. Mich. 1996) (upholding an ADA claim seeking a Telecommunications Device for the Deaf (TDD)). Defendants deny Detained Clients with Disabilities this equal access in several ways.

Defendants permit discriminatory policies at Florence and Krome that specifically deny attorney access to Detained Clients with Disabilities. Detained Clients with Disabilities who have mental health symptoms such as suicidal ideation are more likely than others to be housed in medical or mental health observation or segregation. St. John Decl. ¶ 54; Jacoski Decl. ¶¶ 46, 51.

Defendants limit or bar access to telephones, messaging, and in-person attorney visits in these units, and may not inform counsel about moves to these types of housing, complicating counsel's efforts to contact their clients. St. John Decl. ¶¶ 54-55; Jacoski Decl. ¶ 51. As a result, attorneys have experienced periods as long as multiple months when they are unable to have any contact at all with a Detained Client with a Disability. St. John Decl. ¶ 55; *see also* Jacoski Decl. ¶ 48.

Additionally, many of the constraints discussed above have unique impacts on Detained Clients with Disabilities, resulting in discrimination against them, and exclusion from and denial of benefits. Defendants' refusal to implement a system for scheduling and facilitating attorney-client calls particularly affects Detained Clients with Disabilities. Stewart Decl. ¶¶ 8-11, 13. The call-back system at Florence places the onus on these clients—some of whom have memory impairments or lack orientation to place and time—to comprehend and remember a message that they should call their attorney at a particular time, and then place the call at the correct time. St. John Decl. ¶ 52. Similarly, the complex menu of options that Detained Clients must navigate to access the pro bono platform at Florence and Krome, *see supra* Part II.C.1., poses an even more significant barrier to Detained Clients with Disabilities. St. John Decl. ¶ 52; Jacoski Decl. ¶¶ 18, 48. As a result of these two discriminatory systems, FIRRP experiences even higher rates of unsuccessful call-backs from its Detained Clients with Disabilities than its other clients. St. John Decl. ¶ 52. The lack of VTC at Florence and Krome similarly has a particularly heightened impact on Detained Clients with Disabilities, who require communications with a visual component to develop trust and rapport, and whose attorneys may need to visually assess their clients' mental state or cognition. St. John Decl. ¶ 52; Jacoski Decl. ¶ 49; Stewart Decl. ¶¶ 10, 13. These access issues force FIRRP and AIJ to conduct nearly all communication with Detained Clients with

Disabilities in person—a time-consuming measure that would not be necessary if Defendants were to make available basic, reasonable accommodations. St. John Decl. ¶ 53; Jacoski Decl. ¶ 53.

Detained Clients with Disabilities also experience compounding effects of the barriers to attorney access. Detained Clients with Disabilities require more support and consistent attorney contact to develop trust and effective communication. St. John Decl. ¶ 51; Jacoski Decl. ¶¶ 52-55. Conditions that cause interruptions in contact can prevent Detained Clients with Disabilities from effectively conveying information to their attorneys and thus to the court. St. John Decl. ¶ 51; Jacoski Decl. ¶¶ 52-55. These interruptions in contact can also exacerbate symptoms by contributing to feelings of hopelessness and isolation, or by playing into persecutory or delusional beliefs, which further harms these clients' abilities to participate in their cases. St. John Decl. ¶ 51; Jacoski Decl. ¶¶ 50-52.[45] AIJ has had to turn away cases of potential clients with disabilities at Krome due to attorney access difficulties at the facility. Jacoski Decl. ¶ 48.

Fourth, attorney access is a program or activity carried out by a federal executive agency, here by DHS and its subcomponent ICE. *See* 6 C.F.R. § 15.2 (The Rehabilitation Act applies to "all programs or activities" conducted by executive agencies).

> **E.    Defendants' Failure to Ensure Adequate Access to Counsel at the Four Detention Facilities Causes Detained Clients and Plaintiffs to Suffer Irreparable Harm.**

---

[45] These harms can be remedied in large part by basic accommodations (including scheduled in-person meetings, and facilitated telephone and VTC calls, between Detained Clients with Disabilities and their attorneys, regardless of housing status in segregation). People held at the Central Arizona Detention Center ("CADC"), which is within the same correctional complex as Florence, receive VTC access for attorney calls, as have people held at the complex in the past when it held overflow populations for out-of-state prison systems. St. John Decl. ¶ 40. Florence can reasonably provide that same service to people it holds for ICE. *See Rogers,* 2019 WL 4464036 at *14-15 (finding VTC access to be a reasonable accommodation).

Barriers to attorney access at the Four Detention Facilities violate Detained Clients' Fifth Amendment rights and obstruct Plaintiffs' effective advocacy and organizational missions, causing irreparable harm. A preliminary injunction "requires only a likelihood of irreparable injury," a showing easily met by Plaintiffs. *League of Women Voters*, 838 F.3d at 8-9.

"It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. Dist. of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Plaintiffs have shown that Defendants' restrictions on attorney access violate Detained Clients' due process rights to be free from punishment and to a full and fair custody proceeding. *See supra* Part VI.B. Accordingly, Plaintiffs meet their burden of showing the injury necessary for a preliminary injunction. *See SPLC*, 2020 WL 3265533, at *32.

Defendants' restrictions on confidential attorney-client communication have also caused Detained Clients unnecessary and prolonged detention and subjected them to harmful conditions of confinement. Plaintiffs routinely represent Detained Clients in bond and parole proceedings and requests for release. *See* St. John Decl. ¶ 5; Lehner Decl. ¶ 2; Wolf Decl. ¶ 23; López Decl. ¶ 6; Hidalgo Decl. ¶ 6. However, Defendants' restrictions on confidential communication and effective information-sharing crucial to legal representation cause delays resulting in needless detention of Detained Clients. *See* Wolf Decl. ¶¶ 42, 43, 45, 49; St. John Decl. ¶¶ 19, 55; López Decl. ¶¶ 18-20; Hidalgo Decl. ¶¶ 12, 28. For example, RAICES represented a female client at Laredo in a release request who suffered from a painful medical condition exacerbated when ICE took away her medication, which formed the basis of the release request. However, delays in scheduling private legal calls at Laredo delayed the attorney's ability to learn this highly relevant information, leading to delayed submission of the release request, which was ultimately granted. But for the

deficiencies in arranging confidential legal calls, the client would have been able to be released sooner. Hidalgo Decl. ¶ 12. Similarly, ISLA represented a client at River with a sensitive medical condition who was likely detained longer than he otherwise would have been due to the lack of confidential attorney-client communication. Because the client was unwilling to fully disclose his medical condition in a public setting, ISLA was forced to request and wait for the client's medical records to obtain the necessary information, causing over a week's delay in requesting release. López Decl. ¶¶ 19-20.

Detained Clients have also suffered dangerous conditions of confinement and physical and psychological harm as a result of attorney access barriers. *See* Hidalgo Decl. ¶¶ 21, 28. In one case, RAICES was unable to quickly advocate for the protection of two lesbian clients at Laredo who faced threats of violence within the facility because of their sexual orientation. Because the clients could only call counsel from public phones in their housing units, they feared further harm if they discussed the nature of and reason for their harassment on the phone. As a result,  the clients remained detained longer, and suffered otherwise avoidable harassment. Hidalgo Decl. ¶ 21.

Deprivations of liberty, such as those suffered by Detained Clients due to Defendants' attorney access restrictions, "are the sort of actual and imminent injuries that constitute irreparable harm." *Aracely, R.*, 319 F. Supp. 3d at 155; *see also SPLC*, 2020 WL 3265533, at *32. The "major hardship posed by needless prolonged detention," which Detained Clients have experienced due to the obstacles imposed by Defendants, is in itself a form of irreparable harm. *R.I.L-R*, 80 F. Supp. 3d at 191 (internal quotation omitted). And where, as here, "plaintiff requests injunctive relief mandating that an agency comply with a process that, if completed could secure plaintiff's freedom or could alleviate harsh conditions of confinement, the harm from detention surely cannot be remediated after the fact." *Ramirez v. U.S. ICE*, 310 F. Supp. 3d 7, 31 (D.D.C. 2018).

Defendants' attorney access restrictions also harm Plaintiffs by hindering them from offering quality legal representation to Detained Clients and from serving more clients, both of which are crucial to their organizational missions. *See Pangea Legal Services v. U.S. Dep't of Homeland Sec.*, 512 F. Supp. 3d 966, 975 (N.D. Cal. 2021) ("Organizations can establish irreparable injury by showing ongoing harms to their organizational missions, including the organizational mission of representing [] asylum seekers.") (internal quotations omitted); *see also SPLC*, 2020 WL 3265533, at *12 ("[L]egal aid organizations suffer an injury when their organizational purpose or mission has been thwarted.") (internal quotations omitted). Plaintiffs are impeded in adequately preparing Detained Clients' cases because of the lack of confidential meeting rooms, unreliable, time-limited legal calls, mail delays, and barriers to interpretation. Plaintiff IJC was once forced to communicate with a Detained Client at River via interpretation provided by *another detained person* because of Defendants' failure to provide a reliable means to schedule confidential legal calls necessary for interpretation. Wolf Decl. ¶ 38. FIRRP has represented several clients at Florence who have missed critical filing deadlines due to excessive delays in outgoing mail from the facility. St. John Decl. ¶ 47. These breaches of confidentiality and case-related failings degrade attorney-client relationships and injure Plaintiffs' effective advocacy on behalf of Detained Clients. Delays and inefficiencies caused by Defendants' restrictions on access to counsel also inhibit Plaintiffs from serving more detained immigrants. *See, e.g.,* Hidalgo Decl. ¶¶ 9-10; López Decl. ¶ 38; Jacoski Decl. ¶¶ 51, 57; Wolf Decl. ¶¶ 31-34. Such harms to Plaintiffs demonstrate a likelihood of irreparable injury that will continue without injunctive relief. *See Pangea Legal Services*, 512 F. Supp. 3d at 975-76; *SPLC*, 2020 WL 3265533, at *12.

      **F.**    **The Balance of Equities and Public Interest Weigh Heavily in Plaintiffs' Favor.**

The balance of equities and the public interest merge in cases against the government. *See Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (internal citations omitted). Where Defendants' unlawful restrictions on attorney access deprive Detained Clients of their Fifth Amendment rights and subject them to irreparable harm, both factors tip in Plaintiffs' favor. *See Simms v. Dist. of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) ("It is always in the public interest to prevent the violation of a party's constitutional rights.").

The public—and therefore the government—has an interest in protecting the due process rights of people in detention and ensuring the rule of law. *See Nunez v. Boldin*, 537 F. Supp. 578, 587 (S.D. Tex. 1982) (such protection "goes to the very heart of the principles and moral precepts upon which this country and its Constitution were founded"); *Torres*, 2020 WL 3124216, at *9 ("[T]he public has an interest in the orderly administration of justice."). Moreover, Defendants' policies lead to prolonged detention and inhibit challenges to dangerous and unlawful conditions of confinement—injuries that the public has great interest in avoiding. *See Hernandez-Lara*, 10 F.4th at 33 ("[U]nnecessary detention imposes substantial societal costs.").

Finally, the relief sought is narrowly tailored to remove the unconstitutional barriers to access to counsel and therefore is not an undue burden for Defendants. In fact, as discussed in Part IV.B.1., *supra*, the proposed remedies are procedures Defendants have already put in place at other ICE detention facilities or are required by ICE's own detention standards. *See SPLC*, 2020 WL 3265533, at *33. Thus, the third and fourth factors weigh heavily in Plaintiffs' favor.

## V.    CONCLUSION

For these reasons, Plaintiffs respectfully request that this Court issue a preliminary injunction requiring Defendants to provide at the Four Detention Facilities:

1.    Scheduled, free, confidential, and private legal telephone calls, honored if requested 24 hours in advance (and sooner if urgent), to include legal assistants, interpreters, notaries,

experts, and social workers ("case-related personnel"), with accommodations for interpretation;

2.      Private, confidential spaces for detained people to receive and make legal telephone calls, to include calls to case-related personnel, with clear written and publicly posted instructions for access in proximity to the telephone, such that a detained person would be able to view and read such instructions while using the telephone;

3.      Scheduled, free, confidential, and private legal VTC calls, honored if requested 24 hours in advance (and sooner if urgent), to include case-related personnel, with accommodations for interpretation;

4.      Sufficient private, confidential, contact visitation spaces to conduct in-person legal visits, to include case-related personnel, with access to confidential telephonic interpretation;

5.      The ability for attorneys and case-related personnel to bring computers, printers, and cellular phones with them to in-person legal visits;

6.      A method for timely and confidential legal communication, including document exchange, including by fax or email;

7.      At Florence and Krome, reasonable accommodations for Detained Clients with Disabilities, including allowing counsel and case-related personnel in-person legal visits in observation, medical, mental health, suicide, or segregation housing; providing facilitated, scheduled telephone and VTC legal calls; and providing personnel to manage attorney-access accommodation requests for Detained Clients with Disabilities.

The Court should also order that no security bond shall be required under Federal Rule of Civil Procedure 65.

Respectfully submitted this 18th day of November, 2022.

/s/ Eunice H. Cho
Eunice H. Cho (DC Bar No. 1708073)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth St. N.W., 7th Floor
Washington, DC 20005
(202) 548-6616
echo@aclu.org

Kyle Virgien (CA Bar No. 278747)**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
39 Drumm St.
San Francisco, CA 94111
(202) 393-4930
kvirgien@aclu.org

Jared G. Keenan (AZ Bar No. 027068)
Vanessa Pineda (AZ Bar No. 030996)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF ARIZONA
P.O. Box 17148
Phoenix, AZ 85011
(602) 650-1854
jkeenan@acluaz.org
vpineda@acluaz.org

Arthur B. Spitzer (DC Bar No. 235960)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF COLUMBIA
915 Fifteenth St. NW, 2nd Floor
Washington, DC 20005
(202) 601-4266
aspitzer@acludc.org

Katherine Melloy Goettel (IA Bar No. 23821)†
Emma Winger (MA Bar No. 677608)*
Suchita Mathur (NY Bar No. 5373162)*
AMERICAN IMMIGRATION COUNCIL
1331 G St. N.W., Suite 200
Washington, DC 20005
(202) 507-7552
kgoettel@immcouncil.org
ewinger@immcouncil.org
smathur@immcouncil.org

Stacey J. Rappaport (NY Bar No. 2820520)*
Linda Dakin-Grimm (DC Bar No. 501954)‡
Andrew Lichtenberg (NY Bar No. 4881090)*
Joseph Kammerman (NY Bar No. 5516711)*
MILBANK LLP
55 Hudson Yards
New York, NY 10001
(212) 530-5347
SRappaport@milbank.com
LDakin-Grimm@milbank.com
ALichtenberg@milbank.com
JKammerman@milbank.com

/s/ Danielle S. Lee
Danielle S. Lee (DC Bar No. 1659736)
MILBANK LLP
1850 K Street, NW, Suite 1100
Washington, DC 20006
(202) 835-7532
DLee@milbank.com

Katherine H. Blankenship (FL Bar No. 1031234)*
Daniel B. Tilley (FL Bar No. 102882)*
Janine M. Lopez (DC Bar No. 1685754)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF FLORIDA
4343 W. Flagler St. Suite 400
Miami, FL 33134
(786) 363-2700
kblankenship@aclufl.org
dtilley@aclufl.org
jlopez@aclufl.org

Amien Kacou (FL Bar No. 44302)*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF FLORIDA
4023 N. Armenia Avenue, Suite 450
Tampa, FL 33607
(813) 288-8390
akacou@aclufl.org

Adriana Piñon (TX Bar No. 24089768)*
Bernardo Rafael Cruz (TX Bar No. 4109774)*
Kathryn Huddleston (TX Bar No. 24038188)*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
OF TEXAS
P.O. Box 8306
Houston, TX 77288
(713) 942-8146
apinon@aclutx.org
brcruz@aclutx.org
khuddleston@aclutx.org

*Counsel for Plaintiffs*

*Admitted *pro hac vice*

**Application for admission *pro hac vice* forthcoming.

†Application for admission to the D.C. bar pending; motion for admission *pro hac vice* submitted with the Court.

‡Seeking admission to or renewal of membership in D.D.C.