## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICANS FOR IMMIGRANT JUSTICE, *et al.*,<br>   Plaintiffs,<br><br>  v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br>   Defendants. | Civil Action No. 22-3118 (CKK) |

### MEMORANDUM OPINION
(February 1, 2023)

Several legal services organizations have moved for preliminary injunctive relief in the form of an order mandating that four civil-detention facilities (collectively, "Facilities") institute a swath of policies and mechanisms related to communications between the organizations and detainees housed at those facilities. Asserting third-party standing, Plaintiffs mainly argue that current conditions violate detainees' Fifth Amendment substantive rights to full and fair legal proceedings and to be free from punitive detention. Two of these organizations argue that current conditions violate certain detainees' rights under the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.* Finally, Plaintiffs bring an *Accardi* claim under the Administrative Procedure Act, 5 U.S.C. §§ 555 *et seq.*, arguing that Defendants' purported failure to implement certain governing attorney-access measures at each of the four facilities is (1) a final agency action not in accordance with the law and/or (2) a final agency action unlawfully withheld. Again asserting third-party standing, two of these organizations argue that current conditions violate certain detainees' rights under the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.* Defendants maintain that Plaintiffs have not shown a likelihood of success on any of these claims, irreparable harm, or that the public interest weighs

1

in favor of preliminary relief.

In brief, the Court concludes that one of these organizations has shown a clear likelihood of success on the merits of its substantive due process claim, but that no other organization has made such a showing as to any other claim. The Court therefore crafts a narrow injunctive relief in favor of one Plaintiff only and as to one facility only. Accordingly, and upon consideration of the briefing,[1] the relevant authorities, and the entire record, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' [55] Motion for Preliminary Injunction.

## I.    BACKGROUND

Over the course of almost one thousand pages of briefing, five distinct legal services organizations seek wide-ranging equitable relief at four separate immigration detention facilities in four different states collectively housing thousands of immigrants to this country. In the broadest possible terms, they seek an entire overhaul of all communications policies, technology, and access at each facility, nominally on behalf of clients they never identify and, in part, to ameliorate legal proceedings they barely describe. Although each facility is ultimately answerable to Defendants—the Department of Homeland Security ("DHS"), the Secretary of Homeland

---

[1] The Court's consideration has been focused on the following:

- Plaintiffs' Amended Complaint, ECF No. 53 ("Am. Compl.");
- Plaintiffs' Motion for Preliminary Injunction, ECF No. 55 ("Motion" or "Mot.");
- Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction, ECF No. 66 ("Opp.");
- Plaintiffs' Reply Brief in Support of Motion for Preliminary Injunction, ECF No. 69 ("Repl."); and
- Defendants' Sur-Reply to Plaintiffs' Motion for Preliminary Injunction, ECF No. 76 ("Surreply").

Although the Court has reviewed Plaintiffs' appended exhibits in support of the Motion, ECF Nos. 56-57, the Court relies predominantly on the parties' respective declarations appending to their pleadings.

In an exercise of its discretion, the Court finds that holding oral argument would not be of assistance in rendering a decision. *See* LCvR 7(f).

Security, Immigration and Customs Enforcement ("ICE"), and the Acting Director of ICE—they are nevertheless separate entities, two of which are run relatively autonomously by private companies.  None of these facilities or any individual remotely tied to them is named as a defendant.  With the mammoth task ahead of it, the Court will endeavor to set out only those facts necessary to resolve the pending motion for preliminary relief.

The Court first begins with Plaintiffs:  Americans for Immigrant Justice ("AIJ"), Florence Immigrant and Refugee Rights Project ("FIRRP"), Immigration Justice Campaign ("ICJ"), Immigration Services and Legal Advocacy ("ISLA"), and Refugee and Immigrant Center for Education and Legal Services ("RAICES").

### A.    AIJ

AIJ is a non-profit law firm "that protects and promotes the basic rights of immigrants through direct representation, impact litigation, advocacy, and outreach."  Declaration of Andrea Jacoski, ECF No. 55-3 ¶ 3 ("Jacoski Decl.").  Relevant here, AIJ runs a "Detention Program" which "advises and represents" "at any given time" between "fifteen to twenty clients" in civil immigration detention at the Krome North Service Processing Center in Miami, Florida ("Krome").  *See id.* ¶ 4-5.  Among the legal services provided, AIJ represents clients before the Executive Office for Immigration Review ("EOIR") Immigration Court, in bond hearings and parole applications, and "files lawsuits to remedy inhumane conditions."  *Id.* ¶ 5.  Though less relevant here, AIJ also engages in various advocacy and public policy activities in favor of detained immigrants throughout the United States.  *Id.*  AIJ does not state how many clients they currently represent or otherwise describe the proceedings in which AIJ ostensibly presently represents those clients.  AIJ does, however, state that they represent four clients with mental health disorders, one of whom is also blind.  *Id.* ¶¶ 45, 55.

Before turning to AIJ's specific allegations involving restrictions at Krome, the Court must note that this is not the first time AIJ has sued to better conditions of confinement at Krome on behalf of current or future clients. With others, AIJ filed one such action in 2020 in the United States District Court for the Southern District of Florida to challenge COVID-19-related conditions at Krome. *Gayle v. Meade*, Civ. A. No. 20-cv-21553 (MGC). Notably, it was AIJ's actual clients who were the plaintiffs in action in both cases, and AIJ (with other plaintiffs) appended substantial declarations from those clients. *See* Notice, ECF No. 64, Civ. A. No. 20-cv-21553 (MGC) (Apr. 22, 2020). That record, which Magistrate Judge Jonathan Goodman initially found insufficient for the entirety of preliminary relief requested,[2] stands in marked contrast to the dearth of declarations from individual clients here.

Without such supporting declarations, AIJ nevertheless contends that Krome is noncompliant with ICE's 2011 Performance-Based National Detention Standards ("PBNDS") as amended in 2016.[3] *See* Mot. at 9-11. The PBNDS "establish consistent conditions of confinement, program operations[,] and management expectations" at DHS-run immigration detention facilities. ICE, "Summary of Revisions to the ICE Performance-Based National Detention Standards (Feb. 18, 2022) *available at* https://www.ice.gov/detain/detention-management/2011 (last accessed January 25, 2023 12:15 PM ET). Of these standards, at issue in this suit are sections 5.1, governing "correspondence and other mail," 5.6, governing "telephone access" and 5.7, governing "visitation."

Taking visitation first, AIJ alleges that Krome's attorney visitation rooms are not

---

[2] *See* Report and Recommendations on Emergency Motion for Injunctive Relief, ECF No. 63 at 66-67, *Gayle v. Meade*, Civ. A. No. 20-21553 (MGC) (Apr. 20, 2022) (slip op.).
[3] Again, and unlike in *Meade*, no entity or person directly tied to Krome is named as a defendant.

"[p]rivate" in violation of section 5.6(J)(9), and that Krome does not reliably allow AIJ interpreters to accompany AIJ attorneys, in violation of section 5.6(J)(3)(c). *See* Jacoski Decl. ¶¶ 34, 47. AIJ maintains that interpreters and support staff are subject to a "preapproval process" to accompany attorneys that may take up to two weeks to complete. *Id.* ¶ 37. If such a preapproval process were applied uniformly, that requirement would go beyond a "procedure for random criminal background and warrant checks" envisioned in sections 5.6(I)(3) and (J)(3)(c). AIJ also complains that its attorneys cannot bring laptops or phones with them into visitation rooms, which is not required by the PBNDS, and that AIJ attorneys have had to wait up to an hour-and-a-half to use an attorney-client visitation room. *Id.* ¶¶ 34, 39. The PBNDS do not require facilities to permit anything beyond pen and paper in a visitation room and do not speak to wait times. AIJ's allegations regarding in-person visitation are largely unanswered or explicitly conceded. *See* Declaration of Acting Assistant Field Office Director Jonathan Ruiz, ECF No. 66-2 ¶¶ 23-30 ("Ruiz Decl.").

As for telephonic and VTC communications, AIJ alleges that detainees "must make calls from telephones located in the open housing unit, which are within an earshot of other detained individuals and guards;" detainees are not permitted to make phone calls from an administration office. Jacoski Decl. ¶ 15. AIJ further alleges that these telephones are both next to a recreational television and a guard station. *Id.* ¶¶ 16-17. If true, Krome does not "provid[e] a reasonable number of telephones on which detainees can make [legal] calls without being overheard by staff or other detainees," in violation of section 5.6(F)(2). Calls to pro bono legal service providers must also be "free" pursuant to section 5.6(E)(3), and AIJ maintains that the instructions to access a free line are so complicated as to actually prevent detainees from making free legal calls. Jacoski Decl. ¶ 25. Finally, AIJ complains that calls have occasionally dropped. *Id.* For its part, Krome

maintains that it does in fact offer a free pro bono line, that it posts instructions on how to use the pro bono line, and that phone banks generally permit private calls. Ruiz Decl. ¶¶ 15-22. Defendants agree that there is no VTC conferencing available for legal communications. *Id.* ¶ 24.

Lastly, as to communication of legal documents, Defendants appear to concede that Krome does not permit detainees to use fax or email for legal purposes, which is not required by the PBNDS.

### B.    FIRRP

Like AIJ, FIRRP is a nonprofit law firm that "provide[s] free legal and social services to [] thousands of adults and children detained immigration custody in Arizona." Declaration of Laura St. John, ECF No. 55-9 ¶ 2 ("St. John Decl."). FIRRP specializes in representing "immigrants who are held in geographically isolated detention centers in Eloy and Florence, Arizona." *Id.* ¶ 5. FIRRP represents their clients before EOIR in "bond proceedings, requests for parole, petitions for release[,] credible fear interviews, reasonable fear interviews, and removal defense." *Id.* Despite insisting that FIRRP's clients cannot easily bring suit themselves, FIRRP also admits that it has been counsel of record for their clients as named parties in federal court actions challenging their clients conditions of confinement as to COVID-19 issues. *Id.*

FIRRP states that it represented 249 people "[i]n 2021 alone . . . who were detained in Arizona's ICE detention centers," but does not indicate how many clients detained at any given institution FIRRP currently represents. *See id.* Rather, FIRRP only alleges that it currently "represents seven clients with serious mental health conditions" detained at the Central Arizona Florence Correctional Complex ("Florence"). *Id.* ¶ 50. Also like AIJ, FIRRP attaches no declarations from its former, current, or prospective clients to support its contention that Florence is noncompliant with the 2019 National Detention Standards for Non-Dedicated Facilities

("NDS").[4]  Nor does it identify specific, pending legal proceedings involving a particular client.

For in person visitation, FIRRP alleges conditions worse than those purportedly at Krome. Defendants appear to concede, for example, that Florence has no private rooms in which documents may be passed between attorney and client; worse, visitation areas in which attorneys *can* share documents take place within a "cafeteria"-like setting.  St. John Decl. ¶ 41.  As such, Defendants evidently further concede that it is impossible for an attorney, for example, to secure a signature on a legal document while confidentially discussing that legal document at the same time.

As for telephonic and VTC communications, FIRRP alleges that legal calls made from all housing units "are never confidential" because other individuals are always within earshot, and "[n]o separate phones are provided for legal calls." *Id.* ¶ 19.  Like AIJ, FIRRP also complains that the process for a free legal call is "extremely complicated" because it involves a "multi-step process." *Id.* ¶¶ 24-25.  Additionally, FIRRP claims that "officials at [Florence] and ICE have told [FIRRP] that schedul[ing] [legal] calls [is] not possible[,] largely due to lack of resources and cost." *Id.* ¶ 36.  Finally, Defendants evidently concede that there is not VTC availability for attorney-client communications.

**C.    IJC**

Unlike its fellow Plaintiffs, IJC does not provide direct legal services, and is not itself a law firm.  *See* Declaration of Rebekah Wolf, ECF No. 55-12 ¶ 5. Rather, it identifies specific

---

[4]  Because Florence is managed by a private company, CoreCivic, in contract with the United States Marshal Service, it is subject to this slightly different policy.  *See* ICE, "2019 National Detention Standards for Non-Dedicated Facilities" (Feb. 18, 2022) *available at* https://www.ice.gov/detain/detention-management/2019 (last accessed January 25, 2023 1:10 PM ET).  On cursory review, it appears that Defendants incorrectly maintain that Florence is subject to the now outdated 2008 Performance-Based National Detention Standards.

detainees referred by other organizations to IJC and, in turn, refers those detainees to "volunteer attorneys." *Id.* ¶ 9. Unlike FIRRP, it is not tied to any particular detention facility. *See id.* These "volunteer attorneys" are only loosely affiliated with IJC. Although IJC will occasionally provide these attorneys with "mentoring," it is exclusively the volunteer attorney who takes on a detainee as a client. *Id.* ¶ 14. Although IJC evidently challenges the same conditions of confinement as its fellow Plaintiffs, it does not offer a clear breakdown of the specific conditions challenged like its fellow Plaintiffs. Rather, it recounts specific instances in which volunteer attorneys confronted communications issues at various facilities and how those issues may have impacted then-pending legal proceedings. *See id.* ¶¶ 38-49. Perhaps ironically, IJC's supporting declaration is actually more detailed regarding specific proceedings than those of its fellow Plaintiffs, but, as discussed below, it is less relevant to the disposition of the Motion because IJC does not itself, and evidently will never, represent any detained immigrant.

### D.    ISLA

ISLA is a "nonprofit legal services organization focused on providing pro bono direct representation to detained immigrants in Louisiana." Declaration of Homero Lopez, Jr., ECF No. 55-6 ¶ 1 ("Lopez Decl."). It represents detained immigrants at River Correctional Center in Ferriday, Louisiana ("River"), among other institutions. *Id.* ¶ 4. At River, ISLA currently represents two detainees. *Id.* Although ISLA generally "provide[s] representation in matters including bond hearings, expedited removal and credible fear interviews, parole requests, . . . habeas petitions, [and] civil rights complaints," among others, it does not state in which proceedings it represents its two clients. *See id.* ¶ 6. Because River is managed by a private company, LaSalle Corrections, it is subject to the NDS policy like Florence. *See* ICE, "2019 National Detention Standards for Non-Dedicated Facilities" (Feb. 18, 2022) *available at*

https://www.ice.gov/detain/detention-management/2019 (last accessed January 25, 2023 1:10 PM ET).[5]

As to visitation, ISLA claims that it must provide 24-hours notice to meet with a detainee. *Id.* ¶ 13. The NDS seems to imply that no notice is required, although the Court does not so find as a matter of law here. NDS § 5.5(G)(3)-(4). ISLA also alleges that the private visitation rooms are insufficiently confidential. For example, it maintains that the main visitation room seats subsequent interviewees within earshot of a table used for in-person visitation. Lopez Decl. ¶ 16.

As to communications technology, ISLA alleges that their "clients have told [them] that their phone calls with us take place at a desk in a hallway. There are multiple desks in that hallway where guards are sitting doing work." *Id.* ¶ 31. These spaces are evidently the same as those used for prescheduled, attorney-client calls, even after it is ISLA that schedules the call with River staff. *Id.* ¶ 30. Although there is VTC functionality, Defendants admit that "[t]here are no privacy dividers at tablet kiosks" for VTC calls. Reeves Supp. Decl., ECF No. 71-3 ¶ 5.

Detainees at River also do not have access to email or fax machines. Lopez Decl. ¶ 40.

### E.    RAICES

RAICES is a Texas nonprofit that, among other things, "provides pro bono legal services to low-income immigrants, including immigrants in immigration detention." Declaration of Javier Hidalgo, ECF No. 55-7 ¶ 5 ("Hidalgo Decl."). It challenges conditions of confinement at the Laredo Processing Center in Laredo, Texas ("Laredo"). *Id.* Although it once represented detainees at Laredo, it no longer has any clients detained there. *See id.* ¶ 7; Opp. at 15. Moreover, it has expressly decided to forgo taking on any further Laredo detainees as clients unless and until Laredo

---

[5] Again, Defendants represent that River is actually governed by the 2011 PBNDS. Declaration of Matthew W. Reaves, ECF No. 66-4 ¶ 7. Based on the Court's cursory review, that does not appear to be accurate.

provides RAICES easier access to detainees.  Hidalgo Decl. ¶ 7.

RAICES alleges that, at some point in the past year, the walls between the private visitation rooms were so thin that sound carried easily.  *Id.* ¶ 33.  RAICES also complains that, when they last provided legal services at Laredo, they could not bring laptops or cell phones into visitation rooms.  *Id.*  RAICES further claims that it cannot maintain a confidential call with a detainee (were RAICES to resume legal services to detainees at Laredo) because "other detained people and guards standing near the phone can hear our clients on the phone."  *Id.* ¶ 20.  Like the other Facilities, detainees at Laredo do not have email or fax access. *Id.* ¶ 30-31.

F.    ***Southern Poverty Law Center v. Department of Homeland Security***

Before advancing to the merits, a word on a prior case is necessary.  In 2020, this Court was one of very few in the country to enter a preliminary injunction in favor of a legal services organization asserting third-party standing on behalf of their clients and in an effort to better communications restrictions at several distinct ICE detention facilities.  *SPLC v. DHS*, Civ. A. No. 18-0760, 2020 WL 3265533, at *2 (June 17, 2020).  It is perhaps because of this case that the five legal services organizations here, none of which has any particular ties to the District of Columbia, decided to file suit in the District of Columbia to achieve very similar relief.  The Court's preliminary injunction in *SPLC* also may have led these five legal-services organization to immediately designate *SPLC* as a related case, despite no organization having any relation to SPLC and the detention facilities in this case being distinct from the detention facilities in *SPLC*.

In any event, as necessary context for the reader, the Court provides a brief summary of *SPLC* before proceeding to the merits.  In that case, the Southeast Immigrant Freedom Initiative ("SIFI"), through its parent organization the Southern Poverty Law Center ("SPLC"), sought better access to its clients at four ICE detention facilities.  *Id.* at *8.   Although SPLC first filed for

preliminary relief as to one of the facilities before the inception of the COVID-19 pandemic, the parties resolved that issue without Court intervention. *Id.* However, shortly after the pandemic began, SIFI moved for wide-ranging relief at all the facilities involved in the case, again, on behalf of their present clients. *Id.* They did so because, they alleged and the Court agreed, "in-person consultations [] bec[a]me functionally impossible" due to COVID-19. *Id.* (internal quotation marks omitted). The Court further held that the four facilities' remote visitation options were insufficient, and punitively excessive, to continue the relationship between SIFI (attorney) and detainee (client). Therefore, and *only* on the basis of the COVID-19 pandemic, the Court granted preliminary relief requiring the four facilities to offer better remote-visitation technology. *Id.* at *33-34. The Court explicitly offered no opinion whatsoever on the communications technology required where in-person visitation is not "impossible" due to a global pandemic. *Id.* at *28. Plaintiffs having raised that question here, the Court turns to its resolution.

## II.    LEGAL STANDARD

Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." (internal quotation marks omitted)). A plaintiff seeking preliminary injunctive relief "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley*, 644 F.3d at 392 (internal

quotation marks omitted)).  When seeking such relief, "the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction."  *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)) (internal quotation marks omitted).  "The four factors have typically been evaluated on a 'sliding scale.'"  *Davis*, 571 F.3d at 1291.  Under this sliding-scale framework, "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor."  *Id.* at 1291–92.

It is unclear whether the United States Court of Appeals for the District of Columbia Circuit's ("D.C. Circuit") sliding-scale approach to assessing the four preliminary injunction factors survives the Supreme Court's decision in *Winter*. *See Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C. 2015).  Several judges on the D.C. Circuit have "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'"  *Sherley*, 644 F.3d at 393 (quoting *Davis*, 571 F.3d at 1296 (Kavanaugh, J., concurring)).  However, the D.C. Circuit has yet to hold definitively that *Winter* has displaced the sliding-scale analysis.  *See id.*; *see also Save Jobs USA*, 105 F. Supp. 3d at 112.  In light of this ambiguity, the Court shall consider each of the preliminary injunction factors and shall only evaluate the proper weight to accord the likelihood of success if the Court finds that its relative weight would affect the outcome.

## III.    DISCUSSION

The parties litigate a battery of legal issues that the Court addresses *seriatim*.  First, the Court repeats its holding in *SPLC II* that it has subject matter jurisdiction over this action to the extent Plaintiffs' claims do not arise from immigration removal proceedings.  Second, the Court concludes that all Plaintiffs but IJC have organizational standing to advance their First Amendment

and *Accardi* claims, although the Court does not proceed to the merits of their First Amendment claim because Plaintiffs do not press it in their pending Motion.  Third, the Court holds that all Plaintiffs but IJC and RAICES also have third-party standing to advance their claims.  Because IJC cannot establish constitutional standing, the Court dismisses IJC as a party for lack of jurisdiction.

As to the merits, the Court concludes that only FIRRP makes a clear showing of likelihood of success on its punitive-detention claim on behalf of its present clients.  Because FIRRP makes such a showing on a constitutional claim, the Court finds that its clients suffer irreparable harm and that the balance of the equities weighs in favor of preliminary relief.  Plaintiffs do not establish a likelihood of success on the merits as to any other claim.

However, the preliminary relief that the Court orders is limited.  Within 60 days of the entry of the order accompanying this Memorandum Opinion, Defendants shall ensure that Florence *either* (1) installs six private, confidential attorney-client visitation rooms in which counsel may utilize translation services and physically pass documents to and from their detainee client *or* (2) installs or transfigures a ratio of one telephone to twenty-five detainees that block all others from listening to legal calls while in progress.

## A.    Subject Matter Jurisdiction

The Court begins by briefly addressing subject matter jurisdiction.  As this Court explained in *SPLC II*, federal law bars a district court from exercising jurisdiction over any claim "arising from" a proceeding to remove an immigrant from the United States.  *Id.* at *4 (citing 8 U.S.C. § 1252(b)(9)).  Put differently, if a claim does not "arise from" such a proceeding, then federal district courts otherwise have jurisdiction over such a claim.  *Id.*  The line between a claim that "arises from" such a proceeding and one that does not is, as the Court noted in *SPLC II*, rather

blurred. *Id.* After reviewing relevant precedent and considering section 1252(b)(9)'s text, the Court concluded that it has jurisdiction over a detainee's Fifth Amendment claim where the merits of the claim do not depend upon the effect the challenged conduct has over a pending removal proceeding. *See id.* at *6. Put differently, "on the one hand, where a Fifth Amendment claim centers on the process due in removal proceedings, it is barred; where a Fifth Amendment claim centers on the process due in any other proceedings, on the other hand, it is not barred." *Id.*

Defendants acknowledge this holding and do not ask the Court to revisit it. Rather, Defendants argue that, unlike in *SPLC II*, "organizational plaintiffs [] seek to raise a Fifth Amendment due process access to counsel claim on behalf of their detained clients, whom they represent in both bond hearings and removal proceedings." Opp. at 19. In fact, the plaintiff in *SPLC II* was an organizational plaintiff that did represent detained clients in both bond and removal proceedings. The Court held that it could not exercise jurisdiction over a Fifth Amendment claim tied to removal proceedings, but it could exercise jurisdiction over a claim predicated on bond hearings. *SPLC II* at *8. Because Defendants provide no legal argument to depart from that holding here, the Court shall not revisit it. As such, the Court holds that it has subject matter jurisdiction over each of Plaintiffs' claims to the extent they do not depend on any removal proceedings.

### B.    Organizational Standing

Defendants first argue that no Plaintiff can maintain organizational standing to assert claims on behalf of itself. As noted above, on their own behalf, Plaintiffs advance a First Amendment claim and an *Accardi* claim. Am. Compl. at 66, 68. The standing analysis for organizations is functionally the same as it is for individuals: (1) an injury in fact that (2) caused by the challenged conduct (3) that the Court can redress. *See Haitian Refugee Ctr. v. Gracey*, 809

F.2d 794, 799-80 (D.C. Cir. 1987).   Where an organization's mission or activities are at stake, the organization must show "such concrete and demonstrable injury to the organization's activities— with a consequent drain on the organization's resources—constituting more than simply a setback to the organization's abstract social interests." *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 11 (D.C. Cir. 2011).

On a First Amendment claim, the D.C. Circuit has already held that a legal organization whose access to potential clients has been hindered by government action has organizational standing to challenge such action.   *Ukr.-Am. Bar Ass'n v. Baker*, 893 F.2d 1374, 1378 (D.C. Cir. 1990).   It was "apparent" in that case that "the inability to counsel potential [immigrant detainees] would interfere with [a bar association's] activities [in providing legal services]." *Id.*   As a rule, where government action makes it more difficult for an attorney to communicate with a potential client, the attorney must expend more resources (financial, logistical, etc.) to reach that potential client. *See id.*   Because the Court has the judicial power to remedy constitutional injuries and set aside administrative actions not otherwise in accordance with law, clear appellate precedent mandates a holding that Plaintiffs AIJ, FIRRP, ISLA, and RAICES have standing to advance their First Amendment and *Accardi* claims.[6]

That leaves IJC.   As noted above, IJC does not itself represent detainees.   Rather, it identifies specific detainees referred by other organizations to IJC and, in turn, refers those detainees to "volunteer attorneys."   ECF No. 55-12 ¶ 9.   These "volunteer attorneys" are only

---

[6]  In opposition, Defendants rely almost entirely on *Am. Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352 (D.C. Cir. 2000).   That reliance is misplaced.   *Am. Immigration* deals exclusively with third-party standing; the Circuit began its analysis by explaining that the organizational plaintiffs "ha[d] not pressed their First Amendment claim on appeal[,] leaving only" the claims of others. *Id.* at 1357.

loosely affiliated with IJC. Although IJC will occasionally provide these attorneys with "mentoring," it is exclusively the volunteer attorney who takes on a detainee as a client. *Id.* ¶ 14. Indeed, before a volunteer attorney accepts a referral from IJC, the volunteer attorney must attest that the attorney will provide services to the detainee free of charge, that the attorney will shoulder "all costs associated with the case," and, among other things, "that IJC is available for mentorship, practice resources, and guidance on the case, but is not co-counsel in the case." *Id.* The "mentorship" program involves communications between an IJC attorney (or staff) and the volunteer attorney, but not, as far as the Court can glean from the record, communications between an IJC attorney, a volunteer attorney, *and* a detainee. *See id.* ¶ 16; ECF No. 69-6 ¶ 1 (discussing a case an IJC attorney "mentored" but where only the volunteer attorney communicated with the detainee).

On these facts, IJC has not shown standing to challenge the government activity that, according to the operative complaint, form the basis of its claims. For example, IJC allege in their First Amendment claim that the communications restrictions "have interfered with and obstructed IJC's ability to ensure that their volunteer attorneys have access to Detained Clients." Am. Compl. ¶ 184. Although the communications restrictions may have injured the *attorneys*' efforts to communicate with their clients, they have not injured *IJC* in communicating with detainees. In this regard, IJC has itself shouldered the costs of "redirect[ing] some of its resources to litigation and legal counseling" in furtherance of IJC's public-policy goal of increased representation for immigrants to the United States. *See Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995). Because the injuries allegedly suffered are not the injuries that are the locus of the claims in this matter, IJC has not pled sufficient facts to establish organizational standing.

Although IJC has not pled the argument, it is possible that IJC meant to assert *associational* standing, rather than organizational standing.[7] Unlike organizational standing, which asks whether the organization *itself* has been injured, associational standing asks whether one of the organization's *members* has been injured. *Id.* at 1435. This theory—which the Court addresses only for the purposes of future briefing—fails because, based on the facts as pled, the volunteer attorneys are not IJC's "members." Whether the person on whose behalf the organization asserts standing is its "member" turns on whether "the individual[] play[s] a role in selecting the organization's leadership, in guiding the organization's activities, [or] in financing the organizations activities." *Flyers Rights Educ. Fund, Inc. v. U.S. Dep't of Transp.*, 957 F.3d 1359, 1361 (D.C. Cir. 2020) (finding airline passengers were "members" of passenger rights group because, among other things, passengers answer "petitions" to assist organization leadership in setting organization's priorities and goals). IJC has not pled, for example, that volunteer attorneys are ever involved in management of IJC, ever select IJC's leadership, or even simply pay dues as a member of a bar association might. Nor is there any indication that IJC consults volunteer attorneys at all about IJC's goals and strategies beyond simply matching volunteer attorneys with detainees referred by other organizations. Indeed, the declaration IJC requires a volunteer attorney to sign before receiving an IJC referral explicitly keeps the volunteer attorney at arm's length, providing no financial assistance or any other pecuniary benefit beyond the occasional legal advice.

As such, for the purposes of the operative complaint as it is currently pled, IJC has failed to demonstrate Article III standing. Having failed to do so, IJC is dismissed as a plaintiff for lack

---

[7] The Court addresses this theory *sua sponte* and in dicta only for the sake of completeness and further briefing.

of subject matter jurisdiction.  *See Weaver's Cove Energy, LLC v. R.I. Dep't of Env't Mgmt.*, 524 F.3d 1330, 1334 (D.C. Cir. 2008) (directing court to dismiss party *sua sponte* on jurisdictional grounds where party lacks standing)

### C.  Third-Party Standing

Next, Defendants argue that Plaintiffs RAICES and IJC do not have third-party standing. As the Court explained in *SPLC I*, a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).  The Supreme Court has not "treated this rule as absolute, however," and has "recogniz[ed] that there may be circumstances where it is necessary to grant a third party standing to assert the rights of another." *Kowalski v. Tesmer*, 543 U.S. 125, 129-30 (2004).  These circumstances, however, are quite limited, and usually only found in three contexts: attorney-client, vendor-vendee, and employer-employee. *See id.* at 129.

A party relying on a claim of third-party standing must satisfy three requirements: (1) "injury in fact," (2) "a close relation to the third party," and (3) "some hindrance to the third party's ability to protect his or her own interests."  *Powers v. Ohio*, 499 U.S. 400, 411 (1991); *see Kowalski*, 543 U.S. at 130 (describing latter two requirements as "additional showings" on top of injury in fact requirement).  An injury in fact must be "an invasion of a legally protected interest that is 'concrete and particularized,' 'actual or imminent,' and 'fairly traceable' to the challenged act of the defendant, and likely to be redressed by a favorable decision in the federal court." *Navegar, Inc. v. United States*, 103 F.3d 994, 998 (D.C. Cir. 1997) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).    In the organizational context, the first question is the same as organizational standing, which the Court has already resolved in favor of Plaintiffs.  *See Ukrainian-Am. Bar*, 893 F.2d at 1378.  Therefore, the Court proceeds to the second prong, a close

relationship with an injured third party.

1.    Close Relationship

As the Court explained in *SPLC I*, "the [Supreme] Court has never required a *confidential* relationship between the parties in order to have standing.  To the contrary, it has only required a 'close relation' in the sense that there must be an identity of interests between the parties such that the plaintiff will act as an effective advocate of the third party's interests." *SPLC I* at *13 (quoting *Lepelletier v. FDIC*, 164 F.3d 37, 44 (D.C. Cir. 1999)).  In *SPLC I*, the Court rested its conclusion that the organizational plaintiff maintained third-party standing entirely on "the attorney-client relationship." *Id.* (citing *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989)) (finding that lawyer could bring lawsuit on behalf of criminal defendant).

As to RAICES, the Court concludes that a legal-services organization cannot establish a close relationship with only a hypothetical client.  As discussed above, RAICES has not shown that it currently maintains any attorney-client relationship. *Supra* at 13.  Indeed, it has expressly insisted that it does not even seek an attorney-client relationship with any detainee at Laredo unless and until Laredo makes it easier for RAICES to speak with prospective clients.  As a threshold matter, even lawyers "often fail" to "achiev[e] standing to rely on the rights of their clients;" they generally succeed only, as in *SPLC I*, where they challenge on their clients' behalf "interferences with the ability to provide effective representation."  Wright & Miller 13A Fed. Prac. & Proc. § 3531.9.3 (West 2023) (collecting cases).[8]

Where an organization does not maintain an attorney-client relationship, and does not

---

[8]  The Supreme Court has explicitly found a "close relationship" in an attorney-client relationship where challenged government activity interferes directly with "a third party from entering into a relationship with [an attorney as] the litigant, to which relationship the third party has a legal entitlement (typically a constitutional entitlement)." *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 721 (1990) (Scalia, J.).

actively seek one, the Court runs the risk of ruling on a constitutional issue "unnecessarily, [where] it may be that in fact the holders of those rights [] do not wish to enjoy them." *See Singleton v. Wulff*, 428 U.S. 106, 113-14 (1976) (Blackmun, J.) (plurality op.). To be sure, "an intimate familial or advisorial relationship . . . is not dispositive," but the Court must assure itself that *some* relationship exists lest the Court veer into constitutional decision-making unnecessarily. *See Amato v. Wilentz*, 952 F.2d 742, 752 (3d Cir. 1991). In denying third-party standing to attorneys on behalf of potential clients, the Supreme Court has noted an "*existing* attorney-client relationship is, of course, quite distinct from the *hypothetical* attorney-client relationship." *Kowalski v. Tesmer*, 534 U.S. 125, 131 (2004) (emphasis original). *Accord Hand v. Perez*, Civ. A. No. 14-0880 (BAH), 2015 WL 3534162, at *7 (D.D.C. June 5, 2015) (because "the plaintiff ha[d] not demonstrated any relationship with any known" party whose rights had been affected by the challenged government action, she lacked third-party standing).

The lack of an *actual* attorney-client relationship is even more troubling for standing purposes when considering the ultimate merits of the case. As the Court noted in *Kowalski*, it is substantially more difficult for a litigant to demonstrate third-party standing outside of the context of the First Amendment. *Id.* For example, an attorney generally may not invoke third-party standing on behalf of his client simply to advance *any* of his client's claims. *See Conn v. Gabbert*, 526 U.S. 286, 292 (1999). Indeed, beyond the conditions-of-confinement claim, the organizational plaintiffs will eventually have to show the effects of communications restrictions on *specific* legal proceedings as to *specific* clients. The Court cannot determine whether limited VTC access has impeded a detainee's full-and-fair hearing without considering *how* that limited VTC access has impeded the outcome of *that* hearing. *Infra* at 34. This inquiry necessarily goes beyond whether the relationship itself has been affected and depends upon the existence of an *actual* relationship.

*See HomeAway Inc. v. City and Cty. of S.F.*, Civ. A. No. 14-4859 (JCS), 2015 WL 367121, at *6-7 (N.D. Cal. Jan. 27, 2015). As such, the Court concludes on this basis alone that RAICES has not sufficiently demonstrated third-party standing.

For the sake of completeness, the Court shall pause to explain that, even if IJC had constitutional standing, it would not have third-party standing. First, IJC really attempts to fashion a kind of "fourth-party" standing. Contrary to the operative complaint, which purports to advance third-party claims on behalf of IJC's "Detained Clients," Am. Compl. at 67, IJC does not have clients. At most, IJC occasionally provides resources to volunteer attorneys, and that relationship is between IJC and volunteer attorneys, not IJC and detainees. Truly, IJC attempts to advance another party's attempt to advance claims on behalf of that other party's client.

In this regard, IJC is neither a "vendor" that sells services to customers nor an "employer" who seeks to litigate on behalf of their employees, the two other main categories of litigants that the Supreme Court has found possess the close relationship necessary for third-party standing. *See Lepelletier v. FDIC*, 164 F.3d 37, 44 (D.C. Cir. 1999). In *Lepelletier*, for example, the Circuit applied such precedent to conclude that a plaintiff who sought to "develop a business relationship" with those on whose behalf he possessed third-party standing. *Id.* Similarly, in *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 33 (D.D.C. 2020), a case on which Plaintiffs rely, the plaintiff sought to assert standing on behalf of employees and coworkers suffering the exact same injury as her and who would advance the exact same cause of action as she would. *See id.* at 361. To the extent that this Circuit has implied that *any* "identity of interests" is sufficient to demonstrate a close relationship for third-party standing, as Plaintiffs insist, Supreme Court precedent makes clear that merely sharing the same goals and desires as a third party does not create the requisite relationship. As such, the Court concludes that IJC has not sufficiently

demonstrated third-party standing.

    2.    Hindrance

    Although the Court has concluded that RAICES and IJC fail at the first step, which requires a close relationship, the Court pauses to briefly address the next step, hindrance.  As the Court suggested in *SPLC I*, whether the detainees at the Facilities are hindered in asserting their own rights is very much bound up in the merits of Plaintiffs claims.  The question is the same: whether the communications restrictions across the Facilities prevent sufficient access to judicial process. If so, then the detainees on whose behalf Plaintiffs assert standing are *in fact* hindered.  In *SPLC I*, the Court had little trouble in finding hindrance for the purposes of third-party standing, for it found that the communications restrictions at the detention facilities in that case *did* unconstitutionally restrict access to the plaintiff, their attorneys.[9]  As discussed below, that merits question is much more fraught in this case.

    **D.    Merits**

    1.    Punitive Detention

    The court previously set out the law on Defendant's first substantive due process claim in *SPLC I.*    In the immigration context, detention is "undisputedly civil—*i.e.*, non-punitive in nature."  *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 187 (D.D.C. 2015).  The detainees at issue in this

---

[9]  In light of Defendants' concession in the instant briefing that the remaining Plaintiffs possess constitutional and third-party standing, the Court does not now address the question at any length.  Nevertheless, the Court notes that, unlike the plaintiff in *SPLC*, no Plaintiff here has not yet identified any client's actual identity.  Moreover, AIJ and FIRRP have both already demonstrated that their clients were not hindered in bringing suits themselves to challenge their conditions of confinement in the past.  Neither AIJ nor FIRRP have explained what has changed. That said, because the issue has been conceded, and the doctrine of third-party standing is merely prudential, the Court shall leave whether AIJ has third-party standing for another time.  Whether Plaintiffs AIJ and FIRRP possess statutory standing to advance their third-party Rehabilitation Act claims is addressed below.

case are therefore "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982). "While a convicted prisoner is entitled to protection only against 'cruel and unusual' punishment [under the Eighth Amendment], a [civil] detainee, not yet found guilty of any crime, may not be subjected to punishment of any description." *Hardy v. Dist. of Columbia*, 601 F. Supp. 2d 182, 188 (D.D.C. 2009) (quoting *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992)). As a result, "where it is alleged that a [pretrial or civil] detainee has been deprived of liberty without due process, the dispositive inquiry is whether the challenged condition, practice, or policy constitutes punishment." *Block v. Rutherford*, 468 U.S. 576, 583 (1984).

To make such a showing, a detainee must establish either "subjective intent to punish" or "that a restriction is unreasonable or excessive relative to the Government's proffered justification."[10] *SPLC I* at *18 (quoting *United States v. Moore*, Crim. A. No. 18-198 (JEB), 2019 WL 2569659, at *2 (D.D.C. June 21, 2019)). In other words, the greater the number of "alternative and less harsh methods" to achieve an institution's non-punitive goals, the more likely the challenged conduct is "punitive" within the meaning of the Fifth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 539 n.20 (1979) (pretrial context). Nevertheless, "[c]ourts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility." *Id.* at 539.

Although a number of other cases have considered this question since the Court's opinion

---

[10] Most cases that apply this standard do so in the context of pre-trial detainees in prison. However, there is nothing to suggest that the same standard should not apply to other civil detainees such as the detained immigrants here, and cases have recognized the same. *See, e.g.*, *Doe v. Kelly*, 878 F.3d 710, 714 (9th Cir. 2017) (applying standard in immigration detainee context); *Torres*, 411 F. Supp. 3d at 1064 (same); *cf. Matherly v. Andrews*, 859 F.3d 264, 274-75 (4th Cir. 2017) (applying standard to civil commitment under Adam Walsh Act).

in *SPLC I*, it appears *Torres v. United States Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036 (C.D. Cal. 2019) remains the only case to confront communications restrictions in immigration detention facilities outside the COVID-19 context.   Following the sound analysis in *Torres*, the Court agreed in *SPLC* that restrictions on detainee communications can constitute, in some circumstances, "punitive" detention where "alternative and less harsh methods" are available that equally serve the institution's legitimate interests.  *SPLC I*, 2020 WL 3265533, at *30 (quoting *Torres*, 411 F. Supp. 3d at 1036).

Nevertheless, the Court stresses that its conclusion in *SPLC I* was context dependent.  The Court's conclusion that the plaintiff legal organization was likely to succeed on its third-party punitive-detention claim because COVID-19 effectively vitiated any possibility of counsel meeting with clients in person.  *Id.* at *31.   At that time, the Centers for Disease Control recommended that all institutions "suspend[] or modify[] visitations programs" and provide "alternate means (e.g., phone or video visitation)" to facilitate attorney-client communications.  *Id.* at *21 (quoting CDC, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities at 13, https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf (last updated March 27, 2020)).   In other words, because Defendants were scientifically incapable of eliminating community spread arising from in-person visitation, no "less harsh" alternative in lieu of effective VTC and telephonic communications was available.  *Id.* at *21 (citing, *inter alia*, *Bell*, 441 U.S. at 539 n.20).   For the reasons that follow, the Court concludes that only Plaintiff FIRRP has shown a clear likelihood of success on the merits of its punitive-detention claim.

       i.     *In-Person Visitation*

Here, Plaintiffs concede that there are at least *some* in-person visitation rooms at each of

the Facilities. *See generally* Pl.'s Factual Comparison Chart, ECF No. 69-1. Plaintiffs, however, argue that there are not enough rooms at each Facility and/or some restrictions applied to visits in these spaces nullify the value of in-person visitation. For example, at Krome, AIJ complains (and Defendants concede) that its attorneys cannot bring laptops, printers, or phones into visitation spaces. *Id.* at 1. Plaintiffs further allege that the preapproval process for interpreters is too long to make an in-person visit worthwhile. *Id.* At Laredo, Plaintiffs insist that two rooms are insufficient for a Facility with capacity for 404 detainees, that the rooms are insufficiently private, and that attorneys generally may not bring cell phones or laptops into the spaces. *Id.* At River, Plaintiffs claim that the three rooms are insufficient in number and insufficiently private, and also argue that they should be permitted to bring computers, telephones, and printers with them. *Id.* at 2. Finally, at Florence, Plaintiffs again maintain that two rooms are insufficient for the Facility and also that a policy permitting laptops and phones is unevenly applied. *Id.* at 3.

Usually, a punitive-detention claim proceeds in two stages. First, a plaintiff attempts to show a "presumption" of punitive detention by establishing that the conditions of confinement applicable to civil (e.g., pretrial or immigrant) detainees are equal to or worse than conditions experienced by inmates convicted of a criminal offense. *See Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004); *see also, e.g.*, *Ibarra-Perez v. Howard*, 468 F. Supp. 3d 1156, 1172 (D. Ariz. 2020). As noted above, upon establishing such a presumption, a makeshift burden then generally shifts to the defendant to establish that the conditions are rationally related to a non-punitive purpose and those conditions are not excessive. *See Fraihat v. USCIS*, 16 F.4th 613, 648-49 (9th Cir. 2021).

As a threshold matter, Plaintiffs have not made a clear showing of a "presumption" of punitive detention. To compare the conditions at the Facilities to other institutions, Plaintiffs rely

on four declarations by criminal-defense attorneys.[11]  All but one are limited exclusively to pretrial detention facilities where those detainees possess the same substantive due-process rights as Plaintiffs' current or potential clients.[12]  Only the Tibbitt Declaration mentions what appears to be a carceral institution, a "TGK Correctional Center," but the Declaration does not clarify whether Tibbitt, a "criminal defense attorney," visits *inmates* at this "Correctional Center" rather than merely pretrial detainees.  *Id.* ¶¶ 3, 4-9.  As such, Plaintiffs have yet to show that the in-person visitation restrictions at the Facilities are equal to or worse than those experienced by inmates in punitive detention.

Having failed to make that showing, the Court begins with the general, salutary principle that judges do not make good jailers, and the Court should be wary to assess the particulars of any given restriction.  *Cf. Turney v. Safley*, 482 U.S. 78, 84-85 (1987) ("Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of the government.").[13]  In support of the challenged restrictions, Defendants rely mainly on their interests in "ensuring [internal] security and order" at each of the Facilities.  Opp. at 31 (quoting *Bell*, 441 U.S. at 561).  As Defendants note, even "discomfiting" restrictions that serve these ends are not themselves unconstitutional merely because they are unseemly or, in the view of many, immoral.  *See Bell*, 441 U.S. at 547.

As to limitations on cell phones and computers (at Krome, for example), Defendants tie

---

[11]  Botello Decl., ECF No. 55-4; Blanchard Decl., ECF No. 55-13; Tibbett Decl., ECF No. 55-5; Maldonado Decl., ECF No. 55-8.

[12]  Botello Decl. ¶¶ 7-10, ECF No. 55-4; Blanchard Decl. ¶¶ 4-9, ECF No. 55-13; Tibbett Decl. ¶¶ 4-7, ECF No. 55-5; Maldonado Decl., ¶ 5, ECF No. 55-8.

[13]  *Cf. also Inmates of Occoquan v. Barry*, 844 F.2d 828, 836 (D.C. Cir. 1988) ("the administration of prions implicates broader concerns over judicial competence to decree sweeping modifications in prison settings").

these limitations to security, ECF No. 66-2 ¶ 26, and the Supreme Court explicitly endorsed this justification in *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 332 (2012). As to the other restrictions, although Krome places a plastic divider between a detainee and a visitor in its "Personal Visitation Phone Booths," there is no such obstruction in the six "Contact Visit Rooms" used for legal visits. ECF No. 66-2 ¶ 23. Lastly, restrictions on interpreters and interpretation services do not rise to the level of constitutional opprobrium.

As a threshold matter, the parties significantly differ on the scope of the restrictions. *Compare, e.g.*, Jacowski Supp. Decl. ¶¶ 6-7 *with* Davidson Supp. Decl ¶¶ 12-13. To the extent the Court must resolve these factual disputes at this early stage of the case, it is more difficult to credit Plaintiffs' accounts because they include no affidavits from any interpreter. In any event, it appears only Krome raises a potential problem, because Krome prevents an attorney from contacting an interpreter by telephone. Yet Defendants maintain that "attorneys and legal representatives regularly bring interpreters to client meetings at Krome." Davidson Supp. Decl. ¶ 12. On the Court's review, it does not appear that any of Plaintiff's supporting declarations actually contest this assertion. Laredo and River also offer private rooms for legal consultation, ECF No. 66-3 ¶ 23 (Laredo); ECF No. 66-4 ¶ 18 (River), although ISLA contests the degree of privacy, Lopez Decl. ¶¶ 16-17.

As such, for Krome, Laredo, and River, the question is whether restrictions on in-person legal visitation are "punitive" when: (1) there is a wait time for visitation rooms; (2) attorneys may not bring phones or laptops into some visitation rooms; and (3) there are sometimes bureaucratic challenges in ensuring an interpreter can accompany an attorney where the attorney may not avail themselves of telephonic interpretive services. Because Plaintiffs have not established a "presumption" of punitive detention and Defendants cite their interests in

institutional security, the Court cannot find on the present record that Plaintiffs have *clearly* shown that the challenged restrictions on in-person visitation are not related to non-punitive interests or that the restrictions are "excessive" relative to those interests.    After all, the policies and practices described by Defendants generally (but certainly not entirely) comply with ICE's Performance-Based National Detention Standards.    Each facility has space ensuring that, under Defendants' more experienced telling, "[v]ists between legal representatives and assistants and an individual detainee are confidential and shall not be subject to auditory supervision."    PBDNS § 5.7(II)(2). Additionally, each Facility has "[p]rivate consultation rooms . . . for such meetings."    *Id.*

Defendants perhaps *could* adopt the more permissive policies of the other institutions named in Plaintiffs' declarations, but the Fifth Amendment does not require that they do so.    *Cf. Turner v. Safley*, 482 U.S. 78, 90 (1987).    Just because one pretrial detention facility provides certain amenities does not mean every other pretrial detention facility in America must adopt those amenities lest they "punish" their detainees.[14]

Restrictions at Florence, however, are in a different category.    Florence has no private rooms in which documents may be passed between attorney and client, and visitation areas in which attorneys can share documents take place within a "cafeteria"-like setting.    ECF No. 55-9 ¶ 41.    As such, it is impossible for an attorney to secure, for example, a signature on a legal document while discussing that legal document at the same time.    If only an auditory meeting can occur between attorney and client, then a Facility does not have a "[p]rivate consultation room[] for such meetings."    *See* NDS § 5.7(II)(2).    As such, Plaintiff FIRRP has demonstrated that Florence is not in compliance in any fashion with the NDS as to in-person legal visits.

---

[14]  True, the Supreme Court has effectively adopted such a rule for the Free Exercise Clause.  *See Tandon v. Newsom*, 141 S. Ct. 1294, 1297-89 (2021).  Yet the Court has shown no inclination to extend this rule to other reaches of constitutional jurisprudence.

ii.    *Telephone and VTC Communications*

Plaintiffs also argue that certain VTC and telephone restrictions are unconstitutionally punitive.  Before addressing Plaintiffs' specific complaints, the Court begins by stressing that it previously found certain VTC and telephone restrictions unconstitutionally punitive in *SPLC I* only because the COVID-19 pandemic effectively prohibited in-person visitation.  2020 WL 3265533, at *18.  In other words, without functional VTC and telephone communications, detainees could not communicate with their attorneys *at all*.  *See id.*  Moreover, the Court only found a constitutional violation based on "the totality of these circumstances—[including, but not limited to,] the lack of viability of in-person visits, the scheduling and quality issues of VTC, and the other conditions discussed" and stressed that no *one* restriction could itself trigger a constitutional violation.  *Id.* at *24.

As to telephone access, the Court first reiterates what PBNDS and NDS generally required of the Facilities (although compliance with PBNDS is technically optional) and then turns to Plaintiffs' allegations.  First, the Facilities must "provide detainees with reasonable and equitable access during established facility waking hours."  *Id.* § 5.4(II)(A).  There must be at least "one operable telephone for every 25 detainees," they must generally be kept in working order, and they must be free if made to attorneys.  *Id.* § (II)(C)-(E).  To ensure privacy for legal calls, a facility may install, among other things, privacy panels, separate phones from the earshot of others, or to use an office (i.e., a staff) phone.  *Id.* § (II)(J).

Plaintiffs allege broadly that Krome, Laredo, River, and Florence do not offer private, confidential calls with attorneys mainly due to the placement of telephones.  At Krome, Plaintiff AIJ alleges that detainees "must make calls from telephones located in the open housing unit, which are within an earshot of other detained individuals and guards;" nor are they permitted to

make phone calls from an administration office.  Jacoski Decl. ¶ 15.  AIJ further alleges that these telephones are both next to a recreational television and a guard station.  *Id.* ¶¶ 16-17.  Finally, Plaintiffs claim that there is no method to schedule a call with Krome administration.  Defendants contest all but the precise location of some phones in some residential units relative to guard posts and televisions.  *See* Ruiz Decl. ¶¶ 8-24.  It is more difficult to credit Plaintiffs' supporting declarations because, on the Court's review, it does not appear that the declarant alleges that they have toured all areas with phones.  Again, Plaintiffs incorporate no declaration from any detainee actually resident at Krome.  On the latter point, Defendants appear to offer no response.  As such, it appears from the record as it stands at this early juncture that Krome is in substantial compliance with the PBNDS, notwithstanding some question as to whether there is sufficient privacy as to one bank of telephones in an unidentified housing unit.  *See* Memorandum Opinion and Order, ECF No. 209 at 9, *SPLC v. ICE*, Civ. A. No. 18-0760 (CKK) (D.D.C. June 30, 2022) (slip op.) (discussing substantial compliance in context of PBNDS telephone policy).

All claims as to Laredo are exclusively advanced by RAICES which, as noted above, does not currently represent any detainee at Laredo and does not seek to provide legal services unless and until "it bec[o]me[s] easier to communicate with [potential] clients.[15]  Hidalgo Decl. ¶ 7. RAICES claims that it cannot maintain a confidential call with a detainee (were RAICES to resume legal services to detainees at Laredo) because "other detained people and guards standing near the phone can hear our clients on the phone." *Id.* ¶ 20.  Although a former client presumably conveyed this allegation to a RAICES staff-member, that is pure conjecture from RAICES rather limited

---

[15]  The Court's discussion of conditions at Laredo is largely academic as the Court has concluded above that RAICES likely does not have third-party standing to advance a punitive-detention claim on behalf of nonexistent clients.

declaration.  *See id.*[16]  Additionally, it appears RAICES has scheduled private calls with former clients through Laredo administration, although some Laredo staff were unhelpful or dismissive. *See id.* ¶¶ 23-24.  For their part, Defendants claim that all legal calls are unmonitored, legal calls can be scheduled, and the process for a detainee to schedule a legal call "are posted on bulletin boards located in each dorm and by the telephones as well."  Cerna Decl., ECF No. 66-3 ¶¶ 18-20. As with Krome, it appears that Laredo is in substantial compliance with the PBNDS, notwithstanding some question as to whether there is sufficient privacy as to one bank of telephones in an unidentified housing unit.

For River, Plaintiff ISLA claims that it has represented approximately a dozen detainees held at the institution.  Lopez Decl., ECF No. 55-6 ¶ 4.  ISLA alleges that their "clients have told [them] that their phone calls with us take place at a desk in a hallway.  There are multiple desks in that hallway where guards are sitting doing work." *Id.* ¶ 31.  These spaces are evidently the same as those used for prescheduled, attorney-client calls, even after it is ISLA that schedules the call with River staff. *Id.* ¶ 30.  ISLA's declaration is more substantial and more substantiated than RAICES' and raises serious questions as to whether any confidential telephonic communication is available at River, particularly given Defendants' admission that "[t]here are no privacy dividers at tablet kiosks" for VTC calls.  Reeves Supp. Decl., ECF No. 71-3 ¶ 5.  Without any response by Defendants as to telephonic privacy at River, it does not appear on this record that River is in substantial compliance with the PBNDS policies regarding telephone access.  Again, unlike in *SPLC*, however, Plaintiff ISLA has no supporting declarations by their own clients on which to rely. *See, e.g.*, *SPLC I*, 2020 WL 3265533, at *26.

---

[16] Such a declaration is far more difficult to credit when compared to declarations direct from clients in *SPLC* or a case such as *Torres* in which the clients themselves brought suit.

At Florence, there is no VTC availability beyond the video-call functionality within tablets. Plaintiff FIRRP alleges that legal calls made from housing units "are never confidential" because other individuals are always within earshot, and "[n]o separate phones are provided for legal calls." ECF No. 55-9 ¶ 19. FIRRP further complains that the process for a free legal call is "extremely complicated" because it involves a "multi-step process." *Id.* ¶¶ 24-25. Additionally, FIRRP claims that "officials at [Florence] and ICE have told [FIRRP] that scheduled [legal] calls are not possible[,] largely due to lack of resources and cost." ECF No. 55-9 ¶ 36. Although even this Court in *SPLC I* did not regulate the content of instructions to access free legal calls, it did require confidential calls generally where confidential legal visits were impossible. *See* Memorandum Opinion and Order, ECF No. 209 at 9, *SPLC v. ICE*, Civ. A. No. 18-0760 (CKK) (D.D.C. June 30, 2022) (slip op.). Because, as the Court concluded above, Florence does not actually provide confidential legal visitation, its further failure to ensure confidential legal calls effectively vitiates attorney-client access in its entirety. *See SPLC I*, 2020 WL 3265533, at *31. Florence's invocation of its pecuniary interest in avoiding costs overruns, ECF No. 55-9 ¶ 36, does not suffice. *See id.*; *Bell*, 441 U.S. at 540. Even without reaching issues regarding legal correspondence, therefore, the Court concludes that FIRRP has shown a clear likelihood of success on its punitive-detention claim as to Florence.

### iii.    *Legal Correspondence*

At Krome, Plaintiff AIJ complains that there is no email or fax access for detainees, and staff "usually waits twenty-four hours after receipt to distribute the mail." ECF No. 55-3 ¶ 41. The PBNDS do not require access to email or fax for legal correspondence, and they mandate only that "incoming correspondence shall be distributed within 24 hours of receipt by the facility." PBNDS § 5.1(II)(C). Plaintiff AIJ also protests that Krome staff open legal mail, ECF

No. 55-3 ¶ 41, despite the PBNDS directing facilities to open such mail to inspect it for contraband, PBNDS § 5.1(E)(2).  That said, such "inspection shall be in the presence of the detainee."  *Id.*  Because AIJ does not assert that legal mail is opened outside the presence of their clients, it appears Krome's mail policies are in compliance with the PBNDS.

Like at Krome, there is no email or fax access for detainees at Laredo.  ECF No. 55-7 ¶ 30-31.  Although RAICES alleges one instance of a multi-day delay in the ultimate delivery of legal mail to a former client, RAICES has not demonstrated any systemic delays.  *Id.* ¶ 29.  As such, Laredo appears to be in compliance with the PBNDS.

Detainees at River also do not have access to email or fax.  ECF No. 55-6 ¶¶ 26-28. Although ISLA complains that it faces mail delays that are "longer than average," it does not elaborate.  That said, ISLA alleges that clients must *always* pay to send legal mail.  If true, that does not comply with the PBNDS' requirement that a facility permit an indigent detainee to mail at least five pieces of legal mail per week at the government's expense.  PBNDS § 5.1(H)(2). That said, and particularly without a support declaration by one of ISLA's clients, the Court finds that ISLA has not shown River is noncompliant with the PBNDS.

Although the Court has already found constitutional injury at Florence, it suffices to note that Florence also does not provide email or fax access.  ECF No. 55-3 ¶ 40.

Altogether, whatever challenges detainees may have with legal correspondence, none of these challenges establish a clear likelihood of success on a punitive-detention claim.

*    *    *

As to Krome, River, and Laredo, Defendants' spotty compliance with its internal policies is deeply troubling.  Nor does the Court doubt that the communications challenges the detainees face injure those detainees in some way.  Yet noncompliance with internal policies is not *ipso facto*

a constitutional injury.  A bevy of Supreme Court and Circuit precedent instruct that the Court should be particularly wary to jump into the shoes of a jailer and constitutionalize the mundane operations of detention facilities in the name of substantive due process.  In the past, the Court was willing doing to do so only in the most exceptional of circumstances—a global pandemic.  As pandemic-related restrictions have waned, however, court supervision is far less necessary.  As such, and for the plethora of reasons discussed above, the Court concludes that these Plaintiffs have not demonstrated a clear likelihood of success on the merits of their punitive-detention claim.

Florence, however, is in a category unto its own.  Because it has effectively blocked attorney-access *in toto*, there is no constitutionally sufficient justification to avoid finding such a restriction "excessive" and, therefore, punitive.

2.    Procedural Due Process

To achieve the same relief they seek under their punitive-detention claim, Plaintiffs advance a procedural due process claim predicated on their current and future clients' potential bond proceedings. Am. Compl. ¶ 190.  This claim is prospective—it seeks the requested relief to prevent "wrongful outcomes, delayed relief, and other errors [that] *will* occur in [their clients'] custody proceedings." *Id.* ¶ 192.  The argument appears to be that the conditions of confinement at the Facilities violate a procedural right to a full and fair custody hearing.  The Court need not pause long on this argument.  Because Plaintiffs do not make a facial challenge to some statutory provision of one of ICE's many detention authorities,[17] Plaintiffs must identify some *particular* proceeding in which a *particular* client faces the deprivation of a liberty interest that the Constitution guarantees *that* client.[18]  *Cf. Franklin v. District of Columbia*, 163 F.3d 625, 633

---

[17]  *E.g.*, 8 U.S.C. §§ 1225(b); 1226a, (c); 1226a; 1231(a).
[18]  Nor can the Court determine whether any particular client even has a liberty interest at stake. Of ICE's many detention authorities, the Supreme Court has found only statutory detention

(D.C. Cir. 1998) (requiring showing for standing purposes).  On the present pleadings, the Court cannot even begin to address that question.  Plaintiffs identify no particular client and no particular proceeding.  Moreover, their supporting declarations are entirely retrospective, complaining of *past* injury in *past* bond proceedings that *might* have been caused by reduced access to counsel. *E.g.*, Hidalgo Decl. ¶ 28; Lopez Decl. ¶ 20. As such, Plaintiffs do not establish a likelihood of success on their procedural due process claim.

### 4.  *Accardi*

Next, Plaintiff claims that Defendants purported failure to enforce the PBDNS across each Facility is arbitrary, capricious, or otherwise not in accordance with law in violation of the Administrative Procedure Act.  More specifically, Plaintiffs press an "*Accardi*" claim, predicated upon the Supreme Court's decision in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).  In that case, the Court held that an agency's failure to follow their own "existing valid regulations" when coming to an agency decision may render that decision arbitrary or capricious. *Id.* at 266.  This doctrine continues to be frequently invoked, including in this Circuit.  *E.g.*, *Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005); *Steenholdt v. FAA*, 314 F.3d 633 (D.C. Cir. 2003).

Importantly, an *Accardi* claim is simply a subset of claims for relief cognizable under the APA.  *See Damus v. Nielsen*, 313 F. Supp. 3d 317, 336-37 (D.D.C. 2018) (JEB).  Therefore, as a threshold matter, by invoking *Accardi*, Plaintiffs must nevertheless challenge a final agency action or, to compel action not yet taken, a discrete and final action that is required by law.  *See* 5 U.S.C. §§ 702, 704, 706(a); *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 890 (1990).  In *Damus*, on

---

authority permitting "detention that is indefinite and potential permanent" *per se* offensive to the Fifth Amendment.  *See Zadvydas v. Davis*, 533 U.S. 678, 698 (2001); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 843-44 (2018) (plurality op.) (discussing and cabining *Zadvydas* in dicta).

which Plaintiffs rely, that threshold was easily satisfied—the plaintiffs challenged ICE's failure to enact required procedural safeguards in individual asylum adjudications.  313 F. Supp. 3d at 338. Indeed, most every case Plaintiff cites in support of its argument that the APA provides a cause of action to challenge systemic failures to follow detention standards involved instead a discrete agency action in which the agency adjudicates the rights or liabilities of a particular party. [19] Others either cut against their argument or are inapposite. *E.g.*, *O'Donnell v. USAID*, Civ. A. No. 18-3126 (TNM), 2019 WL 3745069, at *3 (D.D.C. July 1, 2019) (not involving *Accardi*, particular statute did not impose mandatory duty on USAID to develop and release "Country Development Cooperation Strategies").

The only truly apposite case on which Plaintiff relies is (nonbinding) *Torres*, discussed in part above, in which that court found that ICE's failure to implement PBNDS policies was a "final agency action" "unlawfully withheld" under 5 U.S.C. § 706(a) under the facts alleged in the operative complaint.  *See* 411 F. Supp. 3d at 1068-69.  *Torres*, however, relied on a *specific* and deliberate decision not to enforce particular PBNDS provisions *as a rule*.  *Id.* at 1068.  This case differs in two critical respects.  First, Plaintiffs challenge *each* instance of noncompliance as collectively actionable under the APA.  *See* Mot. at 35.  Second, the agency reports in the record actually direct application of the PBNDS; they do not make a concerted, final decision that any one Facility need not comply.  *See generally* ECF Nos. 56-10, 56-11, 56-12, 57-1.  When considering relevant precedent, these distinctions are dispositive.

Whether an agency's action is "final" depends on:  (1) whether it "'consummat[es] [] the agency's deicsionmaking process" and (2) whether it is "one by which rights or obligations have

---

[19] *E.g.*, *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 151 (D.D.C. 2018) (parole requests for asylum seekers); *Moghaddam v. Pompeo*, 424 F. Supp. 3d 104, 120 (D.D.C. 2020) (CKK) (visa adjudication).

been determined, or from which legal consequences flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). This Hornbook test envisions, of course, either adjudication or rulemaking. *See id.* at 177-78. Although other district courts have morphed general practices into an action cognizable under the APA, *e.g.*, *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 166 (E.D.N.Y. 2018), it is the law in this jurisdiction that "an on-going program or policy is not, in itself, a 'final agency action' under the APA," *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001). Rather, a *discrete* and *final* agency action is required, regardless of whether a plaintiff seeks to set aside an agency action or compel one. *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62-63 (2004).

This sensible requirement reflects the challenge of, as Plaintiffs would have the Court do here, reviewing in one fell swoop thousands of individual failures to comply with a particular agency policy in which each individual failure does not itself fix particular legal consequences, particularly where the specifics of those actions may change over time. *See, e.g.*, *C.B.G. v. Wolf*, 464 F. Supp. 3d 174, 225 (D.D.C. 2020) (CRC) (ICE's alleged failures to implement certain COVID policies are various detention facilities were not a final agency action); *Nat'l Immigration Project of Nat'l Lawyers Guild v. EOIR*, 456 F. Supp. 3d 16, 31-32 (D.D.C. 2020) (CJN) (EOIR's alleged failures to implement certain access-to-counsel policies were not final agency action). At bottom, monitoring four Facilities' compliance "with the [PBNDS] in [their] day-to-day operations . . . 'lacks the specificity requisite for agency action.'" *See C.G.B.*, 464 F. Supp. 3d at 266 (quoting *SUWA*, 542 U.S. at 66)). Therefore, the Court concludes that Plaintiffs have not demonstrated a clear likelihood of success on the merits of their *Accardi* claim.

5.    Rehabilitation Act

Lastly, Plaintiffs FIRRP and AIJ advance a Rehabilitation Act claim on behalf of their clients. Because the Court grants the same relief on FIRRP's punitive-detention claim as it would

on FIRRP's Rehabilitation Act claim, it does not proceed to the merits of that claim here. AIJ, however, does not show clear likelihood of success on the merits of *its* Rehabilitation Act claim.

As a threshold matter, Defendants argue that AIJ lacks statutory standing to advance a Rehabilitation Act claim on behalf of its clients, an argument to which Plaintiffs do not respond. Unlike some other statutes, however, the Rehabilitation Act extends a cause of action to a broad class of putative plaintiffs: "any person aggrieved by any act or failure" constituting discrimination. 29 U.S.C. § 794(a)(2). At least two federal Courts of Appeals have held that, at the very least, any entity that provides services to disabled individuals protected by the Rehabilitation Act has standing to challenge discrimination against those individuals so long as such an entity is also injured. *See, e.g.*, *Addiction Specialists, Inc. v. Township of Hampton*, 411 F.3d 399, 406 (3d Cir. 2005) *abrogation in irrelevant part recognized by Rufo v. Fox*, 2022 WL 16646689 (3d Cir. Nov. 3, 2022) (unpublished); *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 46-47 (2d Cir. 1997). For its part, the D.C. Circuit has reached the same outcome as to near identical language in Title VII, extending a cause of action to "any 'person claiming to be aggrieved by' and unlawful employment practice." *Fair Empl. Counc. of Greater Wash., Inc. v. BMC Mtg., Inc.*, 28 F.3d 1268, 1278 (1994). Because any injury to the attorney-client relationship arising from actions proscribed by the Rehabilitation Act necessarily injures AIJ *qua* attorney as well, the Court concludes that AIJ has shown a clear likelihood that it maintains statutory standing to advance a Rehabilitation Act claim on behalf of its clients.

AIJ has not made such a showing on the merits of its Rehabilitation Act claim, however. AIJ alleges that it currently has four disabled clients. ECF No. 55-3 ¶ 45. Three of these clients have a "severe mental illness" for which they "are actively receiving psychiatric treatment," although it is unclear *what* severe mental illness each client has or *which kind* of treatment each

client is receiving.  It appears one of these four clients is also blind.  *Id.* ¶ 55.  Plaintiffs' sole medical declaration, totaling fewer than seven pages, includes no medical details whatsoever on any of Plaintiffs' clients.  *See generally* ECF No. 55-11.

To succeed on its third-party Rehabilitation Act claim, AIJ must show that (1) one or more of its four purportedly disabled clients are "disabled" within the meaning of the Rehabilitation Act; (2) one or more of its four purportedly disabled clients are "otherwise qualified" for a particular program or activity; (3) one or more of its four purportedly disabled clients were "excluded from[] or denied the benefit of" that program or activity; and (4) "the program or activity is carried out by a federal executive agency or with federal funds."  *See Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1266 (D.C. Cir. 2008).  Rehabilitation Act claims are particularly "fact-intensive" and require a searching inquiry into the nature of a plaintiff's disability and the adequacy of proposed accommodations.  *See, e.g.*, *Solomon v. Vilsack*, 763 F.3d 1, 10 (D.C. Cir. 2014); *Brown v. District of Columbia*, 928 F.3d 1070, 1090 (D.C. Cir. 2019) (Wilkins, J., concurring).

Unlike in *SPLC*, which featured declarations from individual clients, and *Torres*, in which detainees themselves brought their own Rehabilitation Act claim, nowhere in Plaintiffs near 900 pages of briefing is there a declaration from any client or doctor describing a particular client's purported disability.   The Court cannot begin to address a Rehabilitation Act claim on the merits without any information on any of:  the specific identity of any clients' disabilities, how disabling their respective conditions are, the details of prior requests for accommodation(s), and the efforts (if any) by Krome to provide any such requested accommodation(s).   At most, AIJ's sole declaration offers some hints as to these details, but nothing more. As such, the Court concludes that AIJ has not demonstrated a clear likelihood of success on the merits of its Rehabilitation Act claim.

### E.    Irreparable Harm

Having addressed on the merits each of the claims Plaintiffs advanced in their pending Motion, the Court turns to the question of irreparable harm.  To warrant preliminary relief, both the United States Supreme Court and the D.C. Circuit have emphasized that a movant must show at least some likelihood of irreparable harm in the absence of an injunction.  *See Winter*, 555 U.S. at 22 (holding that plaintiff must "demonstrate that irreparable injury is likely in the absence of an injunction," and not mere "possibility"); *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995) (concluding that plaintiff must demonstrate "at least 'some injury'" for a preliminary injunction to issue because "'the basis of injunctive relief in federal courts has always been irreparable harm'" (first quoting *Population Inst. V. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986); then quoting *Sampson v. Murray*, 415 U.S. 61, 68 (1974)).  This is because a preliminary injunction "ordinarily is sought to preserve the status quo pending the resolution of the underlying litigation . . . a preliminary injunction that would change the status quo is an even more extraordinary remedy."  *Abdullah v. Bush*, 945 F. Supp. 2d 64, 67 (D.D.C. 2013), aff'd sub nom. *Abdullah v. Obama*, 753 F.3d 193 (D.C. Cir. 2014) (citations omitted).[20]

Because Plaintiff FIRRP has demonstrated a likelihood of success on the merits of its punitive-detention claim, it has shown irreparable injury.  *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("'It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).  The Court need dwell no further on the

---

[20]  Defendants insist that Plaintiffs' Motion is therefore subject to an even higher standard it seeks to alter the status quo.  Not in this Circuit, which has "rejected any distinction between a mandatory and prohibitory injunction."  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016).

question.

As to the remaining Plaintiffs, however, because none of them has demonstrated a clear likelihood of success on the merits in itself there is insufficient support for a finding of irreparable harm. More importantly, Plaintiffs do not identify any *specific* harm that will *certainly* accrue absent this Court's intervention. *See Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 55 (D.C. Cir. 2015) (irreparable harm requires harm "of such *imminence* that there is a clear and present need for equitable relief" (emphasis original)). They identify no proceeding, no imminent deportation, no life-threatening disease, or any other interest that is under immediate threat. *Cf. Church v. Biden*, 573 F. Supp. 3d 118, 139-40 (D.D.C. 2021) (in challenge to vaccine mandate, no irreparable harm where even employment termination was not *certain* to occur). As such, no Plaintiff but FIRRP has demonstrated irreparable harm.

## F.    Balance of the Equities

"The final two factors the Court must consider when deciding whether to grant a preliminary injunction are the balance of harms and the public interest." *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 41 (D.D.C. 2013). Where, as here, the government is a party to the litigation, these two factors merge and are "one and the same, because the government's interest is the public's interest." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). "Although allowing challenged conduct to persist certainly may be harmful to a plaintiff and the public, harm can also flow from enjoining an activity, and the public may benefit most from permitting it to continue." *Sierra Club*, 990 F. Supp. 2d at 41. Therefore, when "balanc[ing] the competing claims of injury," the Court must "consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

Because "[i]t is always in the public interest to prevent the violation of a party's constitutional rights," preliminary relief as to FIRRP is appropriate. *See Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (internal quotation marks omitted); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). As in *SPLC I*, the relief granted also aims to allow FIRRP's clients access to their counsel in part so that they may continue to prosecute any actions seeking release from civil detention on medical grounds. *See Fraihat*, 2020 WL 1932570, at *28 ("[T]here can be no public interest in exposing vulnerable persons to increased risks of severe illness and death.").

Nevertheless, the Court is careful to stay within the bounds of only that which is commanded by the Constitution. When it comes to substantive due process in the context of detention, the Court "must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility." *Bell*, 441 U.S. at 539. At the same time, "[c]ourts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Brown v. Plata*, 563 U.S. 493, 511 (2011). The D.C. Circuit has previously authorized injunctive relief against detention facilities, even where the injunctive relief imposes a particular set of conditions. *See Campbell v. McGruder*, 580 F.2d 521, 551-52 (D.C. Cir. 1978) (finding specific conditions not unduly intrusive because there was "no alternative if the rights of pretrial detainees are to be respected").

Therefore, as a threshold matter, the Court goes no further than what Defendants have promulgated in their PBNDS and NDS. Moreover, to ensure that the Court orders Defendants to provide only what the Constitution guarantees and no more, the Court offers Defendants a choice. Within 60 days of the entry of the order accompanying this Memorandum Opinion, Defendants

shall ensure that Florence *either* (1) installs six private, confidential attorney-client visitation rooms in which counsel may utilize translation services and physically pass documents to and from their detainee client *or* (2) installs or transfigures a ratio of one telephone to twenty-five detainees that block all others from listening to legal calls while in progress.

### IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' [55] Motion for Preliminary Injunction is **GRANTED IN PART AND DENIED IN PART**.  The Motion is **DENIED** as to Plaintiffs AIJ, ISLA, RAICES, and IJC because none has shown a likelihood of success on the merits.  IJC is itself **DISMISSED** as a party for lack of standing.  The Motion is **GRANTED IN PART AND DENIED IN PART** as to FIRRP because they have shown a likelihood of success on the merits of their punitive-detention claim, i.e., it appears quite likely the Florence has functionally stripped detainee-clients of access to their attorneys without due justification.  Because that injury is constitutional in nature, FIRRP's clients will be irreparably harmed absent preliminary relief. Finally, the public interest weighs in favor of the very limited injunctive relief imposed upon Florence.

An appropriate Order accompanies this Memorandum Opinion.


Date:  February 1, 2023

                                        _____/s/_____
                                        COLLEEN KOLLAR-KOTELLY
                                        United States District Judge

43